405 A.2d 525

**COMMONWEALTH of Pennsylvania**

v.

**Stephen PEDANO, Appellant.**

Superior Court of Pennsylvania.

Argued March 22, 1978.

Decided June 1, 1979.

462

William A. George, Media, for appellant.

D. Michael Emuryan, Assistant District Attorney, Chief, Appeals Division, Media, for Commonwealth, appellee.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

PRICE, Judge:

Pursuant to a jury trial concluded on February 18, 1977, appellant was found guilty of burglary,[1] theft by unlawful taking,[2] and theft by receiving.[3] Following arguments on

1. 18 Pa.C.S. § 3502.

2. 18 Pa.C.S. § 3921.

3. 18 Pa.C.S. § 3925.

post-trial motions, the court below arrested judgment on both theft counts, but dismissed a motion for arrest of judgment or a new trial on the burglary count. Appellant was sentenced to a term of imprisonment of not less than eleven (11) nor more than twenty-three (23) months. He now alleges that the court below erred in refusing to direct a verdict in his favor based on the Commonwealth's failure to establish a sufficient chain of evidence with respect to certain fingerprint evidence. We are constrained to agree, and thus reverse the judgment of sentence.[4]

The facts of the case are not in dispute. On Saturday, August 22, 1976, Ralph Wittig, president of Motor Sport, a Datsun Automobile dealership located at 510 West Chester Pike in Haverford, Delaware County, secured the doors of the showroom for the evening and noted that all was in order. At approximately 10:45 the next morning, Officer Thomas Farrell of the Haverford Police Department proceeded to Motor Sport pursuant to a complaint lodged by a pedestrian. At Motor Sport, he discovered a large portion of a showroom window smashed, with shattered glass strewn about the inside of the showroom and the walkway. The five-by-ten foot window was located on the side of the building fronting a parking lot, and adjacent to a walkway leading to the dealership garage. Inside the showroom, the desk nearest the broken window had been gouged and a concrete block lay nearby.

Officer James Dunlap next arrived on the scene and noted a two-by-three foot piece of plate glass leaning against the wall a short distance from the broken window frame. Offi-

---

4. Appellant also alleges four other instances of error;

 (1) the evidence was insufficient to sustain a conviction;

 (2) the court below allowed evidence to be introduced from which the jury could infer prior acts of misconduct by appellant;

 (3) the court below refused to instruct the jury that appellant could not be convicted for both burglary and theft by unlawful taking;

 (4) the court below refused appellant's motion to quash the Magistrate's Transcript/District Attorney Information.

 Because of our resolution of the chain of custody issue, these contentions need not be addressed.

cer Dunlap dusted the piece for fingerprints, and recovered six latent prints; only three of which were later determined to be identifiable. The total amount of property taken from the dealership was confined to a radio display valued at $450 and a gumball machine.

At trial, the Commonwealth's sole evidence connecting appellant with the crime was the set of fingerprints lifted from the piece of glass. The testimony concerning these prints may be summarized as follows. On the first day of trial, Detective Michael C. Olanin was called as a fingerprint expert. He testified that on August 24, 1976, Officer Dunlap asked him to compare the fingerprints on three cards; two containing latent prints and the third being a rolled impression card. The latter is a white fingerprint card containing a single individual's ten fingerprints, and is usually signed by the subject. Detective Olanin stated that the rolled impression card given him by Officer Dunlap was that of appellant. After comparing the impression card with the latent prints on the remaining two cards—which were admitted at trial as exhibits C–1 and C–2—he determined that the prints on the impression card were similar to certain of those on exhibit C–1. The rolled impression card was not introduced into evidence, and was later retained by Detective Olanin.

Following this testimony, appellant's counsel objected and requested a side-bar conference. There, the following discussion took place:

"MR. GEORGE [Counsel for Appellant]: There is no foundation here as to how he is able to identify this card with the defendant's.

THE COURT: I agree with you.

MR. HARRIS [Assistant District Attorney]: We are going to talk about that.

THE COURT: Well, not afterwards, before. I will not permit him to continue without testimony on the record of how he knows that these are the known fingerprints of Stephen Pedano. That is the point I started to say earlier before we started this case. There has to be testimony, not hearsay—

MR. HARRIS: All right.

THE COURT: —that someone took those prints. Then [sic] they were this defendant's prints. And you are going to need another witness, in other words, who will show that the known rolled impression is, in fact, that of Stephen Pedano and the delicate area is to make sure that you don't get any prior offenses in there.

MR. HARRIS: Your Honor, the other witness is a police officer and we have to put him on. I don't know where they were taken, but the other witness who took those before is a Haverford Township Police Officer. That's not a problem, sir.

. . . . .

THE COURT: All right, you don't have to explain how you got them. I am not asking you to do that. I am asking you if you tell me that, then I will let you continue if you have such testimony. That takes care of the known impression. Now, you have not—and I overruled his objection at first about latents and he is starting to talk about latents without telling or indicating on the record whose latents they are and where they came from. He just said Dunlap came to him and gave him these. Now, Dunlap could have given him Joe Blow's, another offense. You have to connect it with this crime. Are you prepared to do that?

MR. HARRIS: Yes, I can have him—have the submitting record of Detective Dunlap. Your Honor, the reason that I didn't do that was I thought Detective Dunlap said that he forwarded them directly to Detective Olanin and that I thought he said he brought—that he found Detective Dunlap sitting at his desk.

THE COURT: Well, if there is some identifying feature on it, yes, but he could forward them from another case and that is what I am suggesting to you. I will let.you continue with the understanding that you are going to follow-up. If you don't, we will strike it and you won't have a case.

MR. HARRIS: I agree with that."

N.T. 81–85.

The following day on re-direct, Officer Dunlap testified that the fingerprints on exhibits C–1 and C–2 were lifted off the two-by-three foot piece of glass found adjacent to the broken window. Directly after securing the prints, he returned them to his office and placed them in a locked file. He later took these prints and a rolled impression card to Detective Olanin.

Finally, the Commonwealth called Detective Joseph Greco. At that time, a rolled impression card was introduced into evidence. Detective Greco testified that the card was signed by appellant and that he had personally taken the fingerprints contained thereon from appellant some five months prior to the burglary.

While the court below was justified in its concern that the Commonwealth establish a foundation for the introduction of the rolled impression card, we believe that it erred in holding that such a foundation had in fact been established. We have no difficulty with the two cards bearing the latent prints; Officer Dunlap testified that exhibits C–1 and C–2 were indeed the cards which contained the prints he lifted off the piece of glass, and which he placed in his file cabinet and later delivered to Detective Olanin. The path followed by the rolled impression card, however, was far more suspect. Detective Greco testified that he took appellant's fingerprints on a rolled impression card—exhibit C–4—and Officer Dunlap testified that he took a rolled impression card to Detective Olanin. The card used by Detective Olanin was not introduced into evidence, nor did he testify that exhibit C–4 was the rolled impression card he examined. Moreover, Detective Greco never stated that he gave exhibit C–4 to Officer Dunlap, who in turn never testified that he took that exhibit and handed it to Detective Olanin together with exhibits C–1 and C–2.

 It is, of course, true that the admission of demonstrative evidence is a matter committed to the discretion of the trial court. *Commonwealth v. Ford*, 451 Pa. 81, 301 A.2d

856 (1973); *Commonwealth v. Jenkins*, 231 Pa.Super. 266, 332 A.2d 490 (1974). Further, there is no requirement that the Commonwealth establish the sanctity of its exhibits beyond a moral certainty. *Commonwealth v. Miller*, 234 Pa.Super. 146, 339 A.2d 573 (1975). Every hypothetical possibility of tampering or identity need not be eliminated; it is sufficient that the evidence, direct or circumstantial, establish a reasonable inference that the identity and condition of the exhibits remained unimpaired until they were surrendered to the court. *Commonwealth v. Miller*, 247 Pa.Super. 132, 371 A.2d 1362 (1977); *Commonwealth v. Rick*, 244 Pa.Super. 33, 366 A.2d 302 (1976); *Commonwealth v. Miller, supra; Commonwealth v. Jenkins, supra.* Thus, while the Commonwealth enjoys a more relaxed burden of proof in this aspect of a criminal trial, it cannot ignore the necessity of demonstrating some reasonable connection between the proffered exhibits and the true evidence.

Instantly, the Commonwealth has simply failed to establish a chain, even a tenuous one, stretching from Detective Greco's fingerprinting of appellant to the rolled impression card employed by Detective Olanin. This is not a minimal discrepancy or an easily explained oversight as in *Commonwealth v. Miller*, 247 Pa.Super. 132, 371 A.2d 1362 (1977). In *Miller*, the property receipt for a gun described the piece as having a side plate screw missing, while the screw was in place on the gun admitted at trial. The Commonwealth there, however, introduced testimony from police personnel who handled the gun in the police laboratories and at the scene of the crime, who proffered a plausible explanation for the discrepancy. Here, we are not faced with a slightly chipped link in a continuous chain, but with a yawning chasm. Because the fingerprint testimony was the only evidence linking appellant with the crime, we have no alternative but to order him discharged.

Judgment of sentence reversed and appellant ordered discharged.

VAN der VOORT, J., dissents.

468

HESTER, J., files a dissenting statement.

JACOBS, former President Judge, and SPAETH, J., did not participate in the consideration or decision of this case.

HESTER, Judge, dissenting:

I dissent. I would affirm on the opinion of Judge Jerome of the court below.