414 A.2d 1381

COMMONWEALTH of Pennsylvania, Appellee,

v.

Bert Lee HUDSON, Appellant.

Supreme Court of Pennsylvania.

Submitted March 12, 1980.

Decided May 30, 1980.

622

Bernard J. Rabik, Beaver, for appellant.

John Lee Brown, Asst. Dist. Atty., Beaver, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

Bert Lee Hudson, appellant, was convicted by a jury in Beaver County of murder of the second degree,[1] aggravated assault,[2] simple assault,[3] and burglary.[4]  Post-verdict mo-

1.  18 Pa.C.S.A. § 2502(b) (Supp.1979–80)

2.  18 Pa.C.S.A. § 2702 (1973)

3.  18 Pa.C.S.A. § 2701 (1973)

4. 18 Pa.C.S.A. § 3502 (1973)

tions were denied, and Hudson was sentenced to life imprisonment on the murder charge and five to ten years on the non-homicide charges. The former sentence was directed to run consecutive to the latter sentence. This appeal followed.

Hudson first contends the evidence at trial was insufficient to establish his guilt of the crimes beyond a reasonable doubt. More precisely, Hudson complains that the evidence was not sufficient to place him at the scene of the crimes. We disagree.

In evaluating the sufficiency of the evidence, the test is whether, viewing the entire record in the light most favorable to the Commonwealth and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to enable the trier of fact to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Smith*, 484 Pa. 71, 398 A.2d 948 (1979); *Commonwealth v. Boyle*, 470 Pa. 343, 368 A.2d 661 (1977). Viewed in this light, the record reveals the following:

In 1975, while in prison, Hudson spoke with David Baker, the son-in-law of William Phillips, Sr. Baker told Hudson about the layout of his father-in-law's residence and that there was a safe therein.

In December 1977, after both Baker and Hudson had been released from prison, Hudson asked Baker if he wanted to join Hudson in burglarizing the Phillips' residence. Baker refused.

In August 1978, Hudson contacted one James Hassett. Hudson and Hassett drove past the Phillips' residence in New Galilee, Beaver County, and while doing so, Hudson told Hassett that he was going to burglarize the house. Hassett initially agreed to join Hudson, but subsequently refused. Hassett informed Hudson of this refusal prior to the commission of the crimes here involved.

In the early morning of September 6, 1978, a stranger entered the Phillips' residence through a first floor window.[5] William Phillips, Sr., his wife, and his son, William Phillips, Jr., were sleeping. The intruder entered the son's bedroom and placed a hand over the son's mouth and a gun to the young man's head. The intruder then taped the son's mouth and hands, and a struggle ensued. The intruder struck the son repeatedly in the head and shot the son in the abdomen. Thereafter, William Phillips, Sr. rushed into his son's room. He was not armed. The intruder fired at William Phillips Sr. A bullet went through his left palm, entered the right side of his face, and lodged in an area of the brain causing injury resulting in instant death.

When the police arrived at the scene of the crimes, they recovered some black electrical tape from the son's bedroom. This tape was later matched to tape belonging to Hudson which was recovered after his arrest.

The police also recovered two bullets, one from the deceased and one from his son. A state police ballistics expert testified that the bullets were fired from the same weapon, probably a .44 or .45 calibre revolver manufactured by Colt. The ballistics expert indicated that the bullets were more likely .45 calibre because of their weight.

Although neither the deceased's son nor his wife identified Hudson, Hudson made several statements in which he admitted the shootings. James Hassett conversed with Hudson shortly after the shootings. Hudson told Hassett that he had a fight with a "younger guy" in the Phillips residence; that he shot the "younger guy"; and, that he shot another "guy" who came "in the room with a gun." Hassett also testified that Hudson had a revolver in his possession and that the revolver was a large calibre, probably a .44 or .45.

Robert Eugene Johnston testified that he conversed with Hudson at Johnston's home after the shootings. Hudson

5. The Commonwealth introduced photographic evidence of a first floor window which depicted scratches and pry marks and which indicated forced entry.

told Johnston that he entered the Phillips residence, went to "young Phillips'" bedroom, put his hand over the son's mouth, and put "the gun in his face." Hudson told Johnston that he woke the son and said "[a]ll I want is food and money." Johnston then testified that Hudson recounted the ensuing struggle and the two shootings. Johnston also testified that Hudson was armed with a Colt .45 calibre gun. Hudson cleaned the weapon in Johnston's residence and showed Johnston a Colt .45 calibre cartridge.

This evidence clearly places Hudson at the scene of the crimes and is sufficient to establish his guilt beyond a reasonable doubt.

To further bolster his sufficiency argument, Hudson challenges the reliability of the testimony of Hassett and Johnston. Citing *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (1976), Hudson argues that the testimony of Hassett and Johnston is so unreliable that a verdict of guilty cannot be based thereon.

In *Commonwealth v. Farquharson,* supra, 467 Pa. at 60, 354 A.2d at 550, this Court stated:

"where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding."

However, in *Commonwealth v. Whack,* 482 Pa. 137, 140, 393 A.2d 417, 419 (1978), we emphasized that the standard announced in *Commonwealth v. Farquharson,* supra, applies only "in such cases where the *patent* unreliability of the testimony is such as to render a verdict of guilt based thereupon as no more than pure conjecture." (Emphasis supplied.)

Instantly, Hudson argues that the standard in *Commonwealth v. Farquharson,* supra, applies to Johnston's testimony because: Johnston had been drinking beer and smoking marijuana when Hudson is said to have admitted the crimes; Johnston stated that Hudson made the admissions to Johnston in September or October of 1978 even though other

prosecution evidence indicated that Hudson was taken into custody in late September of 1978; Johnston informed the police of Hudson's admissions only after Hudson was arrested despite earlier opportunities to inform the police; Johnston, at one time, denied any knowledge of Hudson in statements Johnston made to the police; Johnston was on probation for receipt of stolen goods; and, Johnston was charged with harboring a fugitive in connection with his involvement with Hudson after the crimes had been committed.

We are not persuaded that Johnston's testimony is so "patently unreliable" that a guilty verdict based thereon would be pure conjecture. Johnston's physical condition after consuming drugs is a matter of credibility to be considered by the jury. *Commonwealth v. Whack*, supra. Furthermore, neither inconsistencies in the Commonwealth's evidence nor attempts by Johnston to avoid involvement in a criminal episode render his testimony patently unreliable under the *Farquharson* standard. *Commonwealth v. Whack*, supra; *Commonwealth v. Duncan*, 473 Pa. 62, 373 A.2d 1051 (1977). The fact that Johnston initially gave inconsistent statements to the police is a matter for the jury in determining his credibility. *Commonwealth v. Boyle*, supra. Johnston's prior crimes are also matters going to his credibility and issues of credibility are properly resolved by the trier of fact. *Commonwealth v. Whack*, supra. Finally, although Johnston was charged with harboring a fugitive, this does not render his testimony "patently unreliable."

We have held that the testimony of an accomplice is testimony from a corrupt source and must be carefully scrutinized. *Commonwealth v. Sisak*, 436 Pa. 262, 259 A.2d 428 (1969). We have also held that guilt or innocence may be predicated on uncorroborated testimony of an accomplice. *Commonwealth v. Tervalon*, 463 Pa. 581, 345 A.2d 671 (1975).

Instantly, Johnston apparently did not participate in the perpetration of the crimes in any way. He was charged as an accessory after the fact. An accessory after the fact is

not an accomplice. *Commonwealth v. Richey,* 249 Pa.Super. 365, 378 A.2d 338 (1977). Accordingly, if uncorroborated accomplice testimony may be the basis of a guilty verdict, the testimony of one charged as an accessory after the fact is also competent evidence for that purpose.

The testimony of Hassett is attacked by Hudson as unreliable under *Commonwealth v. Farquharson,* supra, because: Hassett was an admitted drug addict; Hassett was on parole for armed robbery; Hassett was the only one present when Hudson made the inculpatory admissions; Hassett initially denied any knowledge concerning Hudson; and, Hassett agreed to give Hudson money, transportation, and false identification in order to leave the area after the commission of the crimes.

That Hassett used drugs,[6] had a prior criminal record, and was the only witness to inculpatory statements made by Hudson are matters of credibility properly left to the jury's consideration. In addition, that Hassett, like Johnston, initially tried to avoid any involvement in the criminal episode and that Hassett was possibly criminally involved with Hudson after the commission of the crimes[7] do not make Hassett's testimony "patently unreliable" under the standard in *Commonwealth v. Farquharson,* supra.

In sum, a study of the record convinces us that the question of Hudson's guilt was properly for the jury.

Hudson urges that rulings by the trial judge were erroneous and so prejudicial that a new trial is required. In this connection, Hudson initially complains of the trial court's ruling permitting evidentiary use of two photographs of the deceased victim. Hudson contends these photographs were inflammatory because "they depict pools of blood." Hudson further claims that, although the photographs are logically relevant to the instant case, they are legally irrelevant

6. During re-direct examination, Hassett testified that he was enrolled in a drug treatment program pursuant to a condition of parole and that, at the time of trial, he was not a drug addict.

7. During cross-examination, Hassett testified that he was not arrested for his involvement with Hudson.

because their probative value is outweighed by their prejudicial impact on the jury.

Generally, evidence is admissible if it is relevant and competent. This basic rule is equally applicable to the admission of photographs, as well as other types of demonstrative evidence. *Commonwealth v. Batty*, 482 Pa. 173, 393 A.2d 435 (1978). *Commonwealth v. Schroth*, 479 Pa. 485, 388 A.2d 1034 (1978).

The question of the admissibility of photographs of a corpse in homicide cases is a matter within the discretion of the trial judge, and only an abuse of that discretion will constitute reversible error. *Commonwealth v. Batty*, supra; *Commonwealth v. Petrakovich*, 459 Pa. 511, 329 A.2d 844 (1974). To determine whether such photographs are admissible, we have utilized a two-tiered analysis. The trial judge must initially decide whether the photographs possess inflammatory characteristics. If they do not, the photographs are admissible as are any evidentiary items, subject to the qualification of relevance. *Commonwealth v. Batty*, supra. If the photographs are deemed inflammatory, then the trial judge must decide whether the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of their inflaming the passions of the jurors. *Commonwealth v. Batty*, supra.

After an examination of the photographs here challenged, we are satisfied they are not such which would inflame the prejudices of the jury. Moreover, they have probative value. Hence, their admission in evidence was not error.

The photographs are black-and-white and measure eight inches by ten inches. They depict the room where the deceased was killed; the position of the deceased at his death; a dark area around the head of the deceased (apparently blood); and, some crumpled black tape which was used to bind the son of the deceased and which the Commonwealth later introduced to connect Hudson to the crime scene. The deceased is wearing trousers, but no shirt. The

photographs do not show the face of the deceased or any wounds.

Hudson argues the photographs are inflammatory because they show blood. We disagree. The mere fact that blood is visible does not necessarily make photographs inflammatory. *Commonwealth v. Sullivan*, 450 Pa. 273, 299 A.2d 608, *cert. denied*, 412 U.S. 923, 93 S.Ct. 2745, 37 L.Ed.2d 150 (1973). Moreover, we have held similar and even more explicit photographs not to be inflammatory. See, e. g., *Commonwealth v. Woodward*, 483 Pa. 1, 394 A.2d 508 (1978) (photograph depicting bloodied male corpse surrounded by pools of blood); *Commonwealth v. Hilton*, 461 Pa. 93, 334 A.2d 648 (1975) (eight inch by ten inch, black-and-white photograph of clothed corpse without visible wounds and with a small puddle of blood around the head of the corpse); *Commonwealth v. Petrakovich*, supra (eight inch by ten inch, black-and-white photographs showing corpse wearing blood-stained uniform and nude upper torso showing bullet wounds).

The photographs are clearly relevant. They aided the jury by showing the area in which the crimes were committed and the position of the corpse in that area. *Commonwealth v. Woodward*, supra.

Hudson next complains of the trial court's ruling permitting evidentiary use of the electrical tape found at the scene of the crime. Hudson argues that a proper chain of custody for the tape was not established; that the tape was tampered with; and, that the tape was, therefore, inadmissible. We disagree.

The admission of demonstrative evidence is a matter committed to the discretion of the trial court. *Commonwealth v. Ford*, 451 Pa. 81, 301 A.2d 856 (1973); *Commonwealth v. Pedano*, 266 Pa.Super. ——, 405 A.2d 525 (1979). Furthermore, there is no requirement that the Commonwealth establish the sanctity of its exhibits beyond a moral certainty. *Commonwealth v. Pedano*, supra; *Commonwealth v. Proctor*, 253 Pa.Super. 369, 385 A.2d 383

(1978). Every hypothetical possibility of tampering need not be eliminated; it is sufficient that the evidence, direct or circumstantial, establishes a *reasonable* inference that the identity and condition of the exhibit remained unimpaired until it was surrendered to the trial court. *Commonwealth v. Pedano*, supra; *Commonwealth v. Proctor*, supra; *Commonwealth v. Miller*, 234 Pa.Super. 146, 339 A.2d 573 (1975), *aff'd*, 469 Pa. 24, 364 A.2d 886 (1976). Finally, physical evidence may be properly admitted despite gaps in testimony regarding its custody. *Commonwealth v. Bolden*, 486 Pa. 383, 406 A.2d 333 (1979).

Instantly, there is no evidence in the record to support a claim of tampering. The record indicates that State Trooper Francis Keenan discovered the electrical tape at the crime scene in a crumpled condition. Keenan testified that he "collected it, marked it, and took it to the State Police Barracks and put it in the evidence room."

State Trooper John Toner received the tape from Keenan in its crumpled condition. He unraveled it and placed it on a plastic folder "so that it would adhere and the end pieces would stay together." Toner testified that he did not cut the tape "or anything like that." Toner transported the tape, still attached to the plastic folder, to the Pennsylvania State Crime Laboratory at Greensburg. He delivered it to Christine Tomsey, a forensic chemist.

Tomsey testified that she received the tape directly from Toner. She initialed the tape, put a laboratory number on it, and put the date of her analysis on the exhibit. Tomsey further testified that she pieced the sections of tape together in order to determine which edges of the tape were the outer edges. Tomsey then performed a microscopic analysis and matched the outer edge of the tape found at the scene of the crimes with tape belonging to Hudson which was seized by state police after Hudson's arrest.

On cross-examination, Tomsey testified that the tape, as admitted into evidence at trial, was not displayed in the same manner as it was when she received it from Toner. The tape, as exhibited at trial, had been resectioned or

pieced together by Tomsey prior to microscopic analysis. When Tomsey received the tape from Toner, it was wound on the plastic folder and consisted of four sections.

Hudson maintains the tape should not have been admitted at trial because the evidence does not establish a reasonable inference that the tape found at the scene of the crimes remained unimpaired until surrendered to the trial court. *Commonwealth v. Pedano*, supra. Hudson points out that Keenan testified that the tape consisted of two pieces when seized; that Tomsey testified that it was in four pieces when Toner delivered it to her; and, that "the tape was in three (3) pieces when Trooper Toner received the tape from Trooper Keenan." Hudson urges the record reveals no explanation "as to how the tape increased from two (2) pieces to four (4) pieces."

We are convinced that a reasonable inference that the tape remained unimpaired until surrendered at trial has been established; that the trial court did not abuse its discretion; and, that the tape was properly admitted.

Firstly, during cross-examination, Keenan testified that he seized the tape in a crumpled condition and that he *"believe[d]* there were two pieces there." (Emphasis added.) Keenan further testified that he did not watch Toner unravel the tape and place it on the plastic folder; accordingly, Keenan did not actually see the number of sections of tape.

Secondly, the record nowhere supports Hudson's claim that the tape was in three sections when Keenan gave the tape to Toner. The record only reveals that, on cross-examination, Keenan testified the tape was in three sections at the time of trial.

Thirdly, Tomsey did testify that she received the tape in four sections; however, she resectioned the tape for analysis. This resectioned tape was apparently the tape exhibited at trial. This could reasonably account for the four sections being reduced to three sections at the time of trial and does not preclude a reasonable inference that the tape remained unimpaired. Absent evidence indicating that the tape was

altered or tampered with, we accept the reasonable inference to be drawn from the testimony of Commonwealth's witnesses, see *Commonwealth v. Snyder*, 254 Pa.Super. 186, 385 A.2d 588 (1978), namely, that the tape remained unimpaired.

■ Finally, in support of his request for a new trial, Hudson maintains the trial judge erred in allowing one Rodney LeFebvre to testify. Hudson contends that he was prejudiced because the Commonwealth informed defense counsel, at a pre-trial conference, that LeFebvre would not be called as a witness.[8]

On February 21, 1979, the second day of Hudson's trial, prior to the presentation of any testimony, defense counsel were informed that LeFebvre would be called to testify on behalf of the Commonwealth. The record reveals that the Commonwealth furnished defense counsel with LeFebvre's statement prior to trial. Moreover, the trial judge granted a recess, after the direct-examination of LeFebvre, to allow defense counsel to interview LeFebvre prior to cross-examination.

LeFebvre was called to testify on February 23, 1979. Prior to the time LeFebvre was called, he was in Florida.

8. The Commonwealth disputes this claim and contends that, at the pre-trial conference, defense counsel were informed that LeFebvre could not be located and, therefore, could not be called. The Commonwealth maintains that a transcript of an interview with LeFebvre was given to defense counsel in order to inform them of LeFebvre's likely testimony should LeFebvre be located. Hudson admits in his brief to this Court that he received such a transcript several weeks prior to trial.

The trial court, in its opinion, is in substantial agreement with the Commonwealth. The trial court stated:

"Defendant's counsel were not surprised by the existence of Rodney LeFebvre as a possible witness, nor were they apparently surprised by his testimony since they had been provided with a transcript of his interview conducted several weeks prior to trial. Their only surprise was that the Commonwealth finally located LeFebvre."

*Commonwealth v. Hudson*, Nos. 597 and 598, slip op. at 6 (C.P. Beaver County October 18, 1979).

The Commonwealth flew LeFebvre to Beaver County in the early morning of February 23, 1979.

LeFebvre's testimony was limited to the circumstances surrounding his surrender of Hudson's property to state police.[9] The property was placed in LeFebvre's residence by Hudson. Two twigs with black electrical tape wrapped around them were included in the property surrendered by LeFebvre. The tape from these twigs was matched to the tape found at the crime scene.

Since defense counsel had LeFebvre's statement prior to trial, were permitted to interview him, and had the opportunity to cross-examine him, Hudson's complaint, that he was prejudiced by the claimed failure to inform his counsel at the pre-trial conference that LeFebvre would be a witness for the Commonwealth, is devoid of merit. Cf. *Commonwealth v. Gartner*, 475 Pa. 512, 381 A.2d 114 (1977) (plurality opinion) (failure to supply appellants with notes of statements of Commonwealth witnesses at the close of each witness' direct examination not prejudicial where notes were supplied to appellants' counsel before end of trial and appellants were free to recall witnesses for further cross-examination); *Commonwealth v. Hoss*, 445 Pa. 98, 283 A.2d 58 (1971) (no prejudice suffered when three witnesses, not listed in bill of particulars, testified for Commonwealth because witnesses were not discovered until the day of trial and appellant's counsel was afforded an opportunity to question the witnesses before they testified); *Commonwealth v. Dolny*, 235 Pa.Super. 241, 342 A.2d 399 (1975) (allocatur denied) (no prejudice suffered when appellant could not review state crime commission materials prior to trial because appellant's counsel was afforded an opportunity to inspect the materials after *in camera* inspection by the trial judge, the materials were available for use in cross-ex-

9. The Commonwealth was also permitted to ask three additional questions. LeFebvre was asked whether he knew Baker, Hassett, or Johnston. To each question, LeFebvre responded in the negative. Hudson complains about the trial judge permitting these additional questions. However, the complaint is without merit, since Hudson suffered no apparent prejudice from the negative responses.

636

amination, and appellant's counsel was afforded the opportunity to recall any witness for further cross-examination).[10]

Judgments of sentence affirmed.

ROBERTS, J., concurs in the result.

**10.** Hudson also argues that ballistics evidence, by itself, was not sufficient to establish his guilt of the crimes charged and that the trial court erred in refusing Hudson's motion for a directed verdict. Since we will not review a sufficiency claim on a diminished record, see *Commonwealth v. Kuebler*, 484 Pa. 358, 399 A.2d 116 (1979); *Commonwealth v. Boyle*, supra, and since we have concluded that the evidence is sufficient to prove Hudson's guilt beyond a reasonable doubt, these two claims are without merit.