495 A.2d 543

**COMMONWEALTH of Pennsylvania**

v.

**Melvin Dean SMITH, Appellant.**

Superior Court of Pennsylvania.

Submitted March 25, 1985.

Filed June 14, 1985.

1. Since the trial court's opinion at page 8 adequately responds to the appellant's Point # 12 argument, we need say no more.

436

438

W. Hamlin Neely, Allentown, for appellant.

Mark S. Refowich, Assistant District Attorney, Easton, for Commonwealth, appellee.

Before SPAETH, President Judge, and CIRILLO and SHOYER *, JJ.

SPAETH, President Judge:

This is an appeal from judgment of sentence for rape, involuntary deviate sexual intercourse, and robbery. Appellant argues that the trial court erred in instructing the jury regarding the victim's identification testimony, and in failing to instruct the jury that if they found a Commonwealth witness to have been an accomplice, they had to view his testimony with caution. We affirm.

The Commonwealth witness who, according to appellant, could have been found to have been an accomplice, was named Eugene Taylor. Up to a point, appellant's testimony and Taylor's testimony were in agreement. According to this testimony: On February 3, 1983, appellant and Taylor drove a relative, Charlene Chain, from Delaware to Chain's home in Allentown, Pennsylvania. Although they used Taylor's car, appellant drove. They arrived in Allentown between 9 and 10 p.m. and went to a local bar, N.T. at 223–26, 359–62, where they met appellant's brother, John. After accompanying John to a friend's house, where they injected drugs, N.T. at 228–30, 363–65, Taylor and appellant went to a second bar. There appellant spoke with some friends, including Stanley Bell, drank beer, and shot pool. Appellant testified that they went to the second bar around midnight. N.T. at 366.[1] From this point on, appellant's testimony and Taylor's diverged.

According to appellant: He, Taylor, and Bell left the bar around 12:30 a.m., and drove in Taylor's car to a nearby housing project to get some more drugs. They then went to Bell's apartment, where appellant and Bell injected the drugs and drank beer. At about one o'clock, Taylor said he wanted to go to Chain's apartment. Appellant accompanied

---

* The Honorable Kendall H. SHOYER, Senior Judge of the Court of Common Pleas of Philadelphia County, Pennsylvania, is sitting by designation.

1. Taylor testified that he had no watch, and his testimony is vague regarding timing. *See* N.T. at 232; *see, e.g.,* N.T. at 230.

Taylor, to show him where to park, and then left Taylor and returned to Bell's house, where he remained, except for a short period, until the early morning. He did not see Taylor again that night. N.T. at 367–75. Appellant's testimony was corroborated by that of Stanley Bell. N.T. at 287–307.

According to Taylor: He and appellant left the second bar alone. Appellant said that he had arranged to meet a girl and was to follow her home. Appellant drove Taylor's car for an unspecified period of time, at one point following a blue Chevette. N.T. at 233–34. They soon saw a blue Chevette pull into a parking lot, although Taylor didn't know if it was the same car they had been following. Taylor did not know where they were or if they were still in Allentown. A white woman got out of the car, quickly crossed the street, and entered an apartment house. Appellant pulled the car up onto the sidewalk, arousing Taylor's fears that his car was being harmed. Appellant immediately got out of the car, telling Taylor, "I'll be right back." Taylor then saw him "trot" across the street and enter the apartment building. N.T. at 238–43.[2] Taylor waited in the car for approximately twenty minutes and then stopped a police officer to ask directions back to Allentown.[3] After waiting several more minutes for appellant to return, Taylor crossed the street and entered the apartment house. He called up the stairs to appellant. Hearing no response, he returned to the car to wait. About five minutes later, appellant "came trotting across the street," entered the

2. Taylor's testimony was corroborated on this point by that of Officer Haggerty of the Bethlehem Police Department. N.T. at 75–78.

3. Taylor's testimony was corroborated on this point by that of Officer Meixell. According to the officer: He saw Taylor's car and circled the block to investigate. On his return trip, Taylor flagged him down and asked for directions. He told the officer that he was with a friend who had gone to look for directions. The officer checked the registration to determine whether the car had been stolen, and then gave Taylor directions. Taylor told the officer he would wait in the car until his friend's return. The officer saw Taylor get back into the car. He identified Taylor at trial as the man he had seen on February 3. N.T. at 67–68. It was Officer Meixell's check on Taylor's registration that led to Taylor's arrest the next day, after the rape had been reported. *See infra.*

driver's seat, and drove away. He told Taylor that he had just had intercourse. N.T. at 243–48.

The victim, then a senior at Lehigh University, described what had happened as follows. She returned to her apartment in Bethlehem, at about 1:30 a.m.; she had been out with some friends, and during the evening, in a three-hour period, had drunk three glasses of beer. N.T. at 16–17. On returning to her apartment, she parked her car, a blue Chevette, in the parking lot across the street. She ran across the street, entered the building, and ran up the two flights of steps to her apartment, on the third floor. N.T. at 19–22. The entrance hall and the second and third floor landings were lit by 60 watt bulbs. N.T. at 21, 103–07. She is nearsighted, but was wearing her glasses. N.T. at 12, 21. As she put her key in her apartment door, she "heard someone run up the steps and [she] saw a black man running up the second-floor landing towards [her]." N.T. at 22. The hall light was on, above her head. She was asked:

Q. Did you have any difficulty seeing his face?
A. No.
Q. Did you look at him?
A. Yes.

N.T. at 23.

The man ran up the steps and, holding her from behind, held a knife to her neck and said, "Shut up, you white bitch. Don't say anything or I'll kill you." N.T. at 24. While holding her, he reached up and unscrewed the hall light bulb. N.T. at 24. He then ordered her to undress, again threatening her life if she refused. When she did not comply, he undressed her and proceeded to have vaginal and oral intercourse. N.T. at 25–26. Although the assailant pulled the victim's sweater over her head and ordered that she not look at his face, she testified that during oral intercourse she did see his face, lit by the light from the second floor hallway. N.T. at 32–33. When he finished, the assailant demanded money, again threatening to kill the victim if she concealed any money. He then took $21 from

the pocket of the victim's jeans and also took her keys. He tied her up with her socks and left her on the landing. He told her that "if [she] told anyone, he would come back and kill [her] and told [her] not to tell the police. ..." He then ran down the steps. N.T. at 27, 37.

To return to Taylor's testimony: Taylor testified that the trip to Allentown, after appellant returned to the car, took about fifteen to twenty minutes. N.T. at 248. He said that appellant parked the car near Chain's apartment, and that as they walked to appellant's brother's house, appellant gave Taylor a set of apartment keys, saying: "Here. Take the keys. These keys go to the sister's apartment." N.T. at 248. Appellant's mother, who is also Taylor's sister, lives in Allentown. Taylor said that he put the keys in his pocket and went to appellant's brother's house to spend the night. N.T. at 249.

The next morning, Taylor discovered that his car was missing and went to the police station to report it. The police told him that they had impounded the car, and arrested him on charges, *inter alia*, of rape. When Taylor emptied his pockets, the police discovered the keys to the victim's apartment. Taylor was held for three weeks, but he was released and the charges were dropped when the police learned that the fingerprints found on the light bulb from the third floor hallway of the victim's apartment building did not match those of Taylor. N.T. at 251–55.

The prints did, however, match those of appellant.[4] Appellant was then arrested. The victim positively identified appellant at the preliminary hearing, held one month after the crime. N.T. at 39–40. At trial, the victim again positively identified appellant. She testified:

**4.** Detective Owen McFadden of the Bethelehem Police Department testified as an expert in fingerprint identification. He testified that the prints removed from the light bulb matched appellant's at from eighteen to twenty-one points of similarity. He further testified that he required at least ten points of similarity before he would express an opinion that sample prints matched those of a suspect. N.T. at 197–99.

Q. You had a short period of time before the light was unscrewed when you saw the man. Am I correct?

A. Yes.

Q. You also saw the man with limited light from the second floor. Correct?

A. Yes.

Q. Are you certain that this is the man?

A. Yes.

Q. Can you explain to the jury the characteristics of the man's face that caused you to make this identification.

A. I saw his face as he ran up the landing. I saw his hair. I saw his body and his build and I saw him up close when he forced me to have oral sex with him, and I saw him when he ran up the landing and I'm sure that's the man who raped me. I saw him.

N.T. at 40–41.

The victim also identified appellant by voice, after he had testified. N.T. at 382. The jury found appellant guilty and the trial court imposed sentence of, *inter alia*, 10 to 20 years' imprisonment for rape, and 2 to 4 years' for robbery, the sentences to run consecutively. After timely post-verdict motions were filed and denied, this appeal followed.

■ Appellant argues first that the trial court did not properly instruct the jury that they were to consider the victim's identification testimony with caution. In evaluating this claim, we must review the court's charge as a whole, for we may not predicate a finding of error upon isolated excerpts of the charge; it is the general effect of the charge that controls. *See Commonwealth v. Tolassi,* 489 Pa. 41, 413 A.2d 1003 (1980); *Commonwealth v. Woodward,* 483 Pa. 1, 394 A.2d 508 (1978).

The trial court instructed the jury on how they should consider the victim's testimony at various points of the charge:

Let me discuss with you briefly some of the factors that you should consider in deciding whether a witness's testi-

mony is worthy of belief. You should consider the witness's manner of testifying. How did the witness look? How did the witness conduct himself or herself and speak while on the witness stand? Did the witness appear forthright? Did they appear candid in their testimony? Did it have the ring of truth about it? You should consider whether the witness's testimony was affected by any physical or mental condition that would affect the witness's ability not only to recall but to retain what happened. You should consider the witness's intelligence and the witness's ability to observe and be informed about the matters to which that witness testified. You should consider the witness's ability to remember the events about which that witness testified. You should consider whether the witness was positive and certain or whether the witness was hesitant and doubtful about the matters to which the witness testified. You should also consider whether the witness testified frankly or fairly or whether that witness showed favoritism or was biased in any way. You should consider whether the witness has anything to gain or to lose from the outcome of the case.

\* \* \* \* \* \*

Now, identification: Even though a crime has been committed, the defendant may not be found guilty unless the Commonwealth has proven, beyond a reasonable doubt, that this defendant is in fact the one who committed the crimes.

In this case, the Commonwealth's witness, Lisa Reider, the victim, identified the defendant as the one who committed the crime. However, a mistake can be made in identifying a person, even by a witness who is attempting to be truthful. There is evidence in this case that immediately following the incident, Lisa Reider failed to identify the defendant as the one who committed the crime. So in determining whether or not to accept, as accurate identification, testimony of the victim, Lisa Reider, you must also take into consideration the following matters: First, whether the testimony of the identification witness is

generally believable; secondly, whether her opportunity to observe was sufficient to allow her to make an accurate identification; thirdly, how the identification was arrived at; fourthly, all of the circumstances indicating whether or not the identification was accurate and, fifth, whether the identification testimony is supported by other evidence in the case. So that is how you shall approach the identification testimony of Lisa Reider.

N.T. at 393–94, 410–11.

■ While appellant agrees that this charge would be "routinely acceptable," Brief for Appellant at 32, he argues that here special cautionary instructions were required because of the particular unreliability of the victim's identification. He bases this claim on testimony by the investigating officer that in describing her attacker, shortly following the incident, the victim told him that she had not seen his face, N.T. 140, and on the victim's acknowledgment of this fact, on cross-examination, N.T. 58–59.

Our Supreme Court has specified the situations in which an eyewitness's identification will be considered so unreliable as to require special cautionary instructions:

Where the opportunity for positive identification is good and the witness is positive in his identification and his identification is not weakened by prior failure to identify, but remains, even after cross-examination, positive and unqualified, the testimony as to identification need not be received with caution—indeed the cases say that "his [positive] testimony as to identity may be treated as the statement of a fact."

. . . . .

On the other hand, where the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify defendant on one or more prior occasions, the accuracy of the identification is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution.

(citations omitted).

*Commonwealth v. Kloiber,* 378 Pa. 412, 424, 106 A.2d 820, *cert. denied,* 348 U.S. 875 [75 S.Ct. 112, 99 L.Ed. 688] (1954).

Here, the victim's identification was not such as to require either a *"Kloiber* charge" or cautionary instructions different from those given by the trial court. The victim had two opportunities to observe her assailant, in full light, as he came up the stairs to her, and during oral intercourse. N.T. at 21, 26, 22–23, 40. She wore her glasses during the first opportunity, and although she did not during the second, that was at close range so that her nearsightedness would not affect her visual acuity. Her identification was positive at the preliminary hearing and at trial and was not shaken either by cross-examination or possible attempts at intimidation.[5] She also made a positive voice identification. Finally, at no time did she either fail to identify appellant or misidentify another person. *See Commonwealth v. Harrison,* 290 Pa.Super. 389, 434 A.2d 808 (1981) (Applying *Kloiber* factors, court concludes eyewitness identification was sufficiently positive and reliable to support conviction); *compare Commonwealth v. Wiley,* 288 Pa.Super. 397, 432 A.2d 220 (1981) (Analyzing all circumstances, court concludes identification was too speculative and uncertain to support conviction). While both the victim and the investigating officer testified that the victim told the officer, shortly after the incident, that she had not seen her attacker's face, N.T. at 58–59, 140, the victim explained this by saying that she "was scared. He had my keys and he said he would come back and get me and just scared me." N.T. at 64. The trial court's charge properly left to the jury the evaluation of this explanation.

■■■■ Appellant next argues that the trial court erred in denying appellant's oral request that the jury be given an "accomplice" instruction. N.T. at 419. When an accom-

5. On at least two occasions, the court was required to respond to behavior in the spectator's section that had as its purpose, the Commonwealth charged, the intimidation of the victim while she testified. *See* N.T. at 19–20, 32.

plice offers incriminating testimony, a defendant is entitled, upon request, to have the jury instructed that "... the testimony of an accomplice of a defendant, given at the latter's trial, comes from a corrupt source and is to be carefully scrutinized and accepted with caution; ..." (citation omitted) *Commonwealth v. Sisak,* 436 Pa. 262, 265, 259 A.2d 428, 430 (1969). *See also Commonwealth v. Hudson,* 489 Pa. 620, 628, 414 A.2d 1381, 1385 (1980); *Commonwealth v. Upshur,* 488 Pa. 27, 32, 410 A.2d 810, 812 (1980). The purpose of such a charge is clear: "a jury should not embrace testimony offered by an accomplice without a full understanding of the unreliability of the source of that evidence." *Commonwealth v. Banks,* 454 Pa. 401, 412, 311 A.2d 576, 581 (1973). The source of the unreliability is the fear that an accomplice will incriminate his principal because of "the expectation or hope of lenient treatment when testifying for the Commonwealth." *Pennsylvania Standard Jury Instructions: Criminal* § 4.01, (revised 1981) Comment. *See also Commonwealth v. Upshur, supra* 488 Pa. at 32, 410 A.2d at 812, *Commonwealth v. Thomas,* 479 Pa. 34, 37, 387 A.2d 820, 822 (1978). "[W]hen the facts with respect to the participation of a witness in the crime for which the defendant is on trial are clear and undisputed, it is for the court to determine whether or not he was an accomplice, but where the facts are in dispute, or different inferences might reasonably be drawn therefrom, the question whether or not a witness was an accomplice is for the jury." *Commonwealth v. Sisak, supra* 436 Pa. at 267, 259 A.2d at 431, *quoting Commonwealth v. Brown,* 116 Pa.Super. 1, 175 A. 748 (1934). *See also Commonwealth v. Mouzon,* 456 Pa. 230, 318 A.2d 703 (1974); *Commonwealth v. Ciotti,* 318 Pa.Super. 549, 465 A.2d 690 (1983), *vacated on other grounds,* 506 Pa. 10, 483 A.2d 852 (1984). An accomplice charge must be given "not only when the evidence requires an inference that the witness was an accomplice, but also when it permits that inference," *Commonwealth v. Upshur, supra* 488 Pa. at 32, 410 A.2d at 812, *citing Commonwealth v. Sisak, supra,* and it is reversible error for a trial court not to give an accomplice charge

where the evidence permits an inference that a witness was an accomplice, *see id.* Where, however, there is no evidence that would permit the jury to infer that a Commonwealth witness was an accomplice, the court may conclude as a matter of law that he was not an accomplice and may refuse to give the charge. *See Commonwealth v. Tervalon,* 463 Pa. 581, 593, 345 A.2d 671, 677–78 (1975). The question before us, therefore, is whether here the jury could have permissibly inferred that Taylor was appellant's accomplice.[6] We do not believe the jury could have.

■ Section 306(c) of the Crimes Code, 18 Pa.C.S. 306(c), defines an accomplice as:

(c) Accomplice defined.—A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(2) his conduct is expressly declared by law to establish his complicity.

*See also Commonwealth v. Thomas, supra* 479 Pa. at 38, 387 A.2d at 822 ("In other words, an accomplice is an active partner in the planning or commission of the crime"); *Com-*

6. Appellant also argues that the accomplice charge was required because the jury could have found that Taylor was appellant's co-conspirator. Brief for Appellant at 3. Section 903(a) of the Crimes Code, 18 Pa.C.S. § 903(a), defines the crime of conspiracy as:

(a) Definition of conspiracy.—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

The act that constitutes the crime is therefore the agreement. There is no evidence in this record to support an inference that Taylor and appellant agreed to commit the crimes of rape or robbery. Therefore no inference that they were co-conspirators would have been permissible.

*monwealth v. Scoggins,* 451 Pa. 472, 480, 304 A.2d 102, 107 (1973) ("An accomplice is one who knowingly and voluntarily cooperates with or aids another in the commission of a crime and may be indicted for the crime with which the accused is charged."); *Commonwealth v. Wilson,* 449 Pa. 235, 238, 296 A.2d 719, 721 (1972) ("[The] element of shared criminal intent must be found to be present to justify a finding that an accused was an accomplice."); *Commonwealth v. McFadden,* 448 Pa. 146, 150, 292 A.2d 358, 360 (1972) ("To aid or abet in the commission of a crime; one must be an active partner in the intent to commit it.") An accessory after the fact, that is, one who aids the principal after the offense has been committed, is not an accomplice, *see Commonwealth v. Hudson, supra* 489 Pa. at 628–29, 414 A.2d at 1385; *Commonwealth v. Richey,* 249 Pa.Super. 365, 371, 378 A.2d 338 (1977), and foreknowledge that a crime may be committed does not render a person an accomplice, *see Commonwealth v. Fields,* 460 Pa. 316, 333 A.2d 745 (1975).

■ If the jury believed Taylor, they could not have permissibly inferred that he was an accomplice. Appellant was convicted, *inter alia,* of rape and robbery. Taylor testified, however, that he knew only that appellant had agreed to meet a girl and follow her home. There is nothing in this testimony from which a jury would have been permitted to infer the "intent of promoting or facilitating the commission" of the rape or robbery. 18 Pa.C.S. § 306(c)(1). Nor, without establishing the necessary element of intent, could the jury have further inferred "aid[] or agree[ment] . . . in planning or committing [the offense]" from Taylor's act of waiting outside the apartment house or from his position as a passenger in his car. *See Commonwealth v. Hudson, supra* 489 Pa. at 628, 414 A.2d at 1385–86 (where principal confessed crime to witness and witness was charged with harboring a fugitive because of subsequent aid, held: witness was not an accomplice because he "did not participate in the perpetration of the crime in any way"); *Commonwealth v. Tervalon, supra*

463 Pa. at 593, 345 A.2d at 678 (where witnesses were associates of militant group and victim was group member "executed" on orders of group, held: court did not err in refusing corrupt source charge as "there was no evidence presented at trial to indicate that [the witnesses] had any role or participation in the ... killing."); *Commonwealth v. Fields, supra* 460 Pa. at 319–20, 333 A.2d at 747 (where facts of record disclosed that defendant arrived at crime scene with killer, was present during killing, and asked victim provocative questions, held: evidence insufficient to sustain conviction of defendant as accomplice, for "[t]o 'aid or abet' in the commission of a crime one must be an active partner in the intent to commit it[,]" and there was "nothing ... to indicate ... prior knowledge of [the principal's] lethal intent or that [the defendant] in any way counseled or participated in the shooting.); *Commonwealth v. Scoggins, supra* 451 Pa. at 480, 304 A.2d at 107 (where witness lived with defendant, witnessed murder, and lived with defendant afterwards, trial court did not err in ruling that she was not an accomplice for, at best, evidence showed she was an accessory after the fact); *Commonwealth v. Richey, supra* (where witnesses were wives of principal and accomplice, knew beforehand that robbery was planned, received share of proceeds, and attempted to dispose of weapon afterwards, held: court did not err in ruling as a matter of law that they were not accomplices as they lacked requisite intent). *Compare Commonwealth v. Thomas,* 479 Pa. 34, 38, 387 A.2d 820 (1978) (reversible error not to give corrupt source charge where witnesses were members of organization purpose of which was commission of *"ongoing* criminal activit[y]," and where "members had knowledge of these ongoing criminal efforts and actively participated in the organization's overall scheme."); *Commonwealth v. Mouzon, supra* (where witnesses were members of gang, one of whom heard members say they were looking for white boys to fight, court erred in refusing corrupt source charge as jury might permissibly have inferred that witnesses were accomplices in subsequent murder); *Commonwealth v. Ciotti, supra* (where charge was receiving stolen property

and witness agreed to store suspicious goods, later known to be stolen, and received $200 in payment, held: jury might permissibly have inferred he was an accomplice despite his report to police the next day.)

The jury might have believed appellant's testimony, corroborated by that of Bell, and therefore disbelieved Taylor's. However, even on this view, the jury could not have inferred that Taylor was an accomplice. Appellant testified only that he was not present at the scene of the rape. The only permissible inference to be drawn from this testimony regarding Taylor was that Taylor was the principal. Indeed, this is the inference for which counsel for appellant strenuously contended at trial, and for which he now contends on appeal.[7]

Of course, the jury might have believed Taylor in part and disbelieved him in part. Still, the only evidence that might have supported an inference that Taylor participated in the crime as other than a principal was that of the victim's keys, found on Taylor's person by the police. If the jury did not infer from this that Taylor was the principal, it might have inferred that someone gave the keys to Taylor following the rape, but that could show only that Taylor was an accessory after the fact, not an accomplice. *See Commonwealth v. Hudson, supra; Commonwealth v. Richey, supra.*

We therefore conclude that whether the jury believed or disbelieved Taylor, in whole or in part, it could not have permissibly inferred that Taylor was appellant's accomplice in perpetrating the rape and the robbery. That being so, the trial court did not err when it denied appellant's request that it give an accomplice charge, for "[a] trial court is not obliged to instruct a jury upon legal

7. At trial, counsel for appellant attempted to prove that the victim's and Officer Haggerty's descriptions of the assailant's build and clothing matched those of Taylor, not of appellant. *See, e.g.,* N.T. at 55–56, 1313–34. *See also* Brief for Appellant at 27: "The victim's description of her attacker, as well as the police description of Taylor, ... all point to Taylor having been the individual who perpetrated the attack."

452

principles [that] ... have no applicability to the presented facts." *See Commonwealth v. Tervalon, supra* 463 Pa. at 593, 345 A.2d at 678.

Affirmed.