J. S38006/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :       IN THE SUPERIOR COURT OF
                                                      :                 PENNSYLVANIA

                       v.              :

                                             :

ROBERT PARKER,                 :             No. 2975 EDA 2012

                                             :

             Appellant       :


Appeal from the Judgment of Sentence, September 27, 2012,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0002366-2010


BEFORE:  FORD ELLIOTT, P.J.E., BOWES AND SHOGAN, JJ.


MEMORANDUM BY FORD ELLIOTT, P.J.E.:**FILED DECEMBER 23, 2014**

Following a jury trial, Robert Parker was convicted of burglary, sexual assault, and rape.   Herein, he appeals from the judgment of sentence entered on September 27, 2012, in the Court of Common Pleas of Philadelphia County.  We affirm.

The victim,[1] was living on the 2500 block of West Oxford Street in Philadelphia.   The victim suffered from scleroderma and rarely left the house; her daughters lived with her and were her caretakers.  (Notes of testimony, 9/13/11 at 46-49.)  On January 27, 1997, her oldest daughter, T.U., came home and locked up the house for the night, propping a stick under the front door's handle for extra measure.  (*Id.* at 54.)  T.U. went to

---

[1] The victim died from cancer on January 31, 2010.  (*Id.* at 46-47.)

her mother's third floor bedroom, and they watched television together until approximately 2:00 a.m. (***Id.*** at 52.) The victim then instructed T.U. to retire to the second floor for the night, as T.U. was talking on the telephone. (***Id.*** at 53.) T.U. went to her bedroom and continued to talk on the phone and watch television.

At approximately 5:00 a.m., T.U. heard her mother's footsteps on the stairs and then heard knocking on her locked bedroom door. When T.U. opened the door, she found her mother shaking and crying. (***Id.*** at 56.) The victim told her daughter that someone had broken into the house and raped her.

T.U. went to check the house, and when she got downstairs, she saw that the stick was missing from the door. A window in the rear first floor bedroom had been broken and the screen was split. (***Id.*** at 61.) The victim called the police, and Officer Robert Billips arrived. Officer Billips testified that he spoke with the victim, who was frantic, nervous, and very emotional. The victim told the officer that an unknown man had entered her bedroom and placed his hand over her mouth. Without a condom, he vaginally raped her, and attempted to anally rape her at gunpoint.

The victim was admitted to the hospital, and the staff took "vaginal, cervical, vulva, and anal swabs from [the victim] for a rape kit." (***Id.*** at 189.) No identification was made and no other leads produced results. As part of a task force to review rape cases where no identification had been

made, the Philadelphia Police Department DNA laboratory ("DNA laboratory") prepared a profile. The rape kit was stored and was identified by the property receipt numbers.

In 2002, the DNA laboratory performed a DNA analysis of the rectal swab. Brian Phleegor ("Phleegor"), a scientist in the lab, testified as an expert witness for the Commonwealth. (*Id.* at 23.) Phleegor prepared the DNA laboratory report on the victim's case, number 97-70139. (*Id.* at 24.) Phleegor did not personally analyze the swab, but he did serve as the technical reviewer of the analyst's report. (*Id.* at 25.)[2] He testified that two items were tested -- the victim's blood and rectal swab. (*Id.* at 28.) Phleegor stated that the resulting DNA profile from the rectal swab was loaded into a local database but it did not lead to a "hit"; that is, a match with another profile in the database. (*Id.* at 27, 34.)

The case was reassigned to Detective Linda Pace in the special investigations squad in 2002. The originally assigned detective had retired, the file had gone "missing," and the case had been deemed "cold." (*Id.* at 95-98.) In her attempt to re-create the case file, Detective Pace interviewed the victim on January 24, 2002. She prepared a "John Doe" arrest warrant

---

[2] Chad Summerfield, a forensic scientist, performed the analysis but is no longer working for the lab. (*Id.* at 26.)

indicating the assailant's DNA profile based on the rectal swab.[3] (**Id.** at 97-102.)

Phleegor testified that on March 26, 2007, the DNA laboratory was notified of a completely different "hit" -- a match between appellant's DNA profile on the national Combined DNA Index System ("CODIS")[4] and the DNA profile from the vaginal swab of the victim. (**Id.** at 37.) Again, Phleegor did not testify that he had any involvement with the DNA analysis of the vaginal swab, which was performed in 2004 in Bodi Scientific Laboratory ("Bodi"); Bodi is a private lab that the DNA laboratory used for subcontract work at that time. (**Id.** at 149.) Before the name was provided, the Pennsylvania State Police had to re-analyze their sample to confirm that the DNA report was correct. Philadelphia police protocol also required that the victim be interviewed again to ensure the identified match could not be excluded. (**Id.** at 37-38, 64-68.) Phleegor did not testify to the results of the re-analysis. (**Id.** at 64-67.)

---

[3] When the name of the individual is not known, a "John Doe" DNA warrant/complaint may be filed. The DNA profile of the perpetrator, provided by the evidence in the investigation, is used as the unique identifier describing the defendant, instead of his or her name. Such a filing prevents the running of the statute of limitations in serious violent crimes.

[4] The DNA laboratory is an accredited laboratory; and beginning in 2004, it was enabled to upload its forensic samples into CODIS. (**Id.** at 149-150.) This national DNA database contains "many millions" of samples and is an effective database. (**Id.** at 150.)

Upon notification of this match, Detective Pace located the victim, who now lived in Reading; the victim agreed to meet with Detective Pace. However, on the appointed date, the victim did not appear, and the detective subsequently lost contact with her. Detective Pace put the case aside until October 16, 2008, when she tried to relocate the victim. (Notes of testimony, 9/12/11 at 18-20; 9/14/11 at 106-109.) It was not until February 15, 2009, that Detective Pace could locate and arrange to meet with the victim. (Notes of testimony, 9/14/11 at 106-109.)

The victim was shown an array consisting of eight different photographs, including a photograph of appellant from 1997. (*Id.* at 110.) The victim did not recognize any of the men. (*Id.*) However, based on the photo array, the interview with the victim, and the CODIS match, Detective Pace obtained a warrant for a DNA sample from appellant to confirm the CODIS match. (*Id.* at 111.) Pace was present when a swab from inside appellant's cheek was taken; it was then sent to the DNA laboratory for analysis and was confirmed that appellant was a match. (*Id.* at 113-116.) The statistical frequency of the DNA profile match was one per 888 quadrillion in the African American population, one per 681 quadrillion in the Caucasian population, and one per 368 quadrillion in the Hispanic community. Appellant was arrested on August 9, 2009. (*Id.* at 115-116.)

Kevin Knox, a scientist at the DNA laboratory, also testified as an expert witness for the Commonwealth. (*Id.* at 135, 140.) Knox provided the jury with an explanation of DNA evidence, profile, and the analysis performed. (*Id.* at 140-147.) He stated that in 2009, he performed a DNA analysis of appellant's buccal swab and compared it to the DNA profile derived from the victim's vaginal swab. (*Id.* at 149-156.) Knox explained that these items were submitted on a property receipt as part of the chain of custody and submitted to the laboratory. (*Id.* at 153.) He then provided a detailed explanation as to the match which was established. (*Id.* at 155-160.) Knox also explained that the passage of time from 1997 would not affect the evidence, as the samples are preserved and all of the rape kit swabs were frozen in minus 20 degree freezers. (*Id.* at 160.)

The victim became ill and was hospitalized. The scheduled preliminary hearings were continued, as the victim was unavailable. A bedside preliminary hearing was scheduled, as the victim was dying from cancer; however, the victim died before the hearing occurred. Appellant was held for trial after the Commonwealth located the victim's daughter to testify as to the victim's excited utterance immediately after the rape.

Prior to trial, appellant moved for discharge under Rule 600 and for pre-arrest delay; the motions were denied. At trial, the Commonwealth presented the testimony of T.U., three police officers, and two expert witnesses who had been involved in the 2002 and 2007 DNA analyses.

Appellant presented his own expert, and his sister testified, claiming that appellant did not live in the victim's neighborhood at the time of the rape.

Appellant was convicted of rape, burglary, and sexual assault. Thereafter, the court imposed an aggregate sentence of 8 to 16 years' incarceration. On October 2, 2012, appellant filed post-sentence motions seeking reconsideration of sentence. The trial court denied the motion without a hearing. (Docket #15.) A timely notice of appeal was filed, and appellant complied with the trial court's order to file a concise statement of errors complained of on appeal within 21 days pursuant to Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A.

Herein, the following issues have been presented for our review:

1. Did not the trial court err and abuse its discretion by permitting Commonwealth witnesses to testify in this rape trial to a DNA profile purportedly obtained from a vaginal sample of the complainant where the sample's chain of custody, spanning twelve years and two states, was not properly established?

2. Did not the trial court err in denying appellant's motion to dismiss the prosecution based on improper and prejudicial pre-arrest delay in violation of his due process rights under the Pennsylvania and United States Constitutions?

3. Did not the trial court err in denying appellant's motion to dismiss the prosecution based on a violation of his right to a prompt trial under Pa.R.Cr.P. 600?

Appellant's brief at 4.[5]

Appellant first claims that the Commonwealth failed to establish a proper chain of custody for the vaginal swab, which was analyzed in a Bodi laboratory in Virginia that led to a "hit" in the national DNA database. (Appellant's brief at 12.) Prior to trial, defense counsel pointed to the custodial gap as to the initial documentation and storage of the samples in 1997 and the gap regarding the vaginal sample's transport to Virginia in 2004. (Notes of testimony, 9/14/11 at 4, 7-8; appellant's brief at 13.)[6] No relief is due.

The admissibility of evidence is a matter addressed solely to the discretion of the trial court and may not be reversed absent a showing that the court abused its discretion. **Commonwealth v. Begley**, 780 A.2d 605, 620 (Pa. 2001). An abuse of discretion is "not merely an error of judgment; rather, discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record."

---

[5] Additional issues contained in his Rule 1925(b) statement have not been presented to our court in his brief; hence, we deem them to have been abandoned.

[6] We disagree with the Commonwealth that this contention was not preserved; we find defense counsel's argument at trial sufficiently preserves the chain of custody issue. Defense counsel repeatedly lodged objections during the course of testimony related to the chain of custody.

*Commonwealth v. Busanet*, 817 A.2d 1060, 1076 (Pa. 2002) (citation omitted).

Appellant claims that the Commonwealth failed to adequately prove the chain of custody since it did not set forth who placed the swabs on a property receipt, who delivered them to the lab, who received them at the lab, or how many people were even involved with the process. (Appellant's brief at 14.) Appellant maintains that no one that had involvement or direct knowledge about the handling of the vaginal sample testified. (*Id.* at 19.) Rather, the witnesses cited a property receipt number associated with the same which "merely reflected what [was] gleaned from documents prepared by others." (*Id.*) Appellant repeatedly emphasizes, "no witnesses supplied a link in the twelve-year, two[-]state custodial chain." (*Id.* at 20.) Thus, he maintains the absence of such testimony demonstrates the chain of custody was not proven.

We agree with the Commonwealth that gaps in the chain of custody, the underlying issue of appellant's argument, go to the weight of the evidence and not its admissibility. *Commonwealth v. Copenhefer*, 719 A.2d 242, 256 (Pa. 1998). Moreover, "[t]here is no requirement that the Commonwealth establish the sanctity of its exhibits beyond all moral certainty. It is sufficient that the evidence, direct and circumstantial, establish a reasonable inference that the identity and condition of the exhibits remain unimpaired until they were surrendered to the court."

*Commonwealth v. Feliciano*, 67 A.3d 19, 29 (Pa.Super. 2013) (*en banc*), quoting *Commonwealth v. Martin*, 419 A.2d 795, 798 (Pa.Super. 1980). "There is no rule requiring the prosecution to produce as witnesses all persons who were in a position to come into contact with the article sought to be introduced in evidence. Physical evidence may be properly admitted despite gaps in testimony regarding custody." *Id.*, quoting *Commonwealth v. Jenkins*, 332 A.2d 490, 492 (Pa.Super. 1974).

Appellant relies extensively on *Commonwealth v. Pedano*, 405 A.2d 525 (Pa.Super. 1979), and argues that the Commonwealth fell well short of what is required to prove a chain of custody. In *Pedano*, this court reversed a conviction after finding that the Commonwealth did not establish a chain of custody for a rolled fingerprint impression card. Therein, Detective Greco testified that he took the defendant's fingerprints on a rolled impression card. Another detective, Detective Dunlap, stated that he turned over a rolled impression card to a Detective Olanin. Detective Olanin, who was called as a fingerprinting expert, did not testify that the card he examined was the one taken by Detective Greco. Detective Greco also failed to state that he handed his impression card to Detective Dunlap. Based on this evidence, the *Pedano* court ruled that there was a "yawning chasm" in the chain of custody relative to the rolled impression card, and that the Commonwealth failed to lay a proper foundation for its introduction. *Id.* at 528.

Appellant also cites ***Ellis v. Unemployment Comp. Bd. Of Review***, 749 A.2d 1029, 1031 (Pa.Cmwlth. 2000). In ***Ellis***, a case not binding on this court, an employee was denied unemployment compensation after her employer discharged her for failing a drug test. ***Id.*** at 1029. The employee contended that evidence of her failed drug test was inadmissible because the employer provided no chain of custody evidence for the urine sample prior to its arrival at the testing center. ***Id.*** at 1031. The Commonwealth Court agreed and concluded that the urine sample was inadmissible, stating the following:

> We have held that gaps in the chain of custody go to the weight to be given to the testimony and not to its admissibility. Here, however, there was not simply a gap in the chain of custody evidence; there was a complete absence of evidence regarding the custody of [the employee's] urine sample from the time it was collected from [her] until it was received by the Laboratory for testing.

***Id.***

In the case at bar, we find that the Commonwealth sufficiently established a proper chain of custody with regard to the evidence procured from the victim's samples. As the trial court states, "the Commonwealth established that the DNA evidence connecting [appellant] to the crime was placed on [a] property receipt and that its integrity remained sacrosanct." (Trial court opinion 8/2/13 at 12, citing notes of testimony, 9/14/11 at 5.) It was stipulated that a rape kit was prepared with swabs from the victim's rectum, vagina, vulva, and cervix when she was in Jefferson Hospital

immediately after the incident. (Notes of testimony, 9/14/11 at 189-190.) Property receipt numbers and laboratory numbers associated with the samples were presented.

The Commonwealth's experts described how evidence is typically received and logged in by the forensic laboratory. Testimony was presented as to the accreditation of the labs involved, including the requirements to follow certain protocol and report errors made; none were reported here. (*Id.* at 149-151, 164-174.) The Commonwealth's expert explained the way the evidence was stored to slow degradation of the samples. Knox testified that Bodi sent a report back to the DNA laboratory, where Knox reviewed it for accuracy.

There was also evidence about the taking of the buccal swab from appellant, the property receipt and lab numbers it was given, and the analysis of appellant's DNA; this was done to confirm the match made by the computer system. Expert testimony was presented concluding that the DNA profile derived from appellant's buccal swab was an exact match to the profile from the male DNA on the vaginal swab taken from the victim. (*Id.* at 156, 159-160.)

We cannot find that the trial court abused its discretion in concluding the Commonwealth established a sufficient chain of custody. The defense detailed the gaps in the chain of custody with each of the Commonwealth's

witnesses and the weight to be accorded the gaps was for the jury. ***Copenhefer***, ***supra***.

The second issue presented is whether the trial court erred in denying appellant's motion to dismiss the prosecution based on improper and prejudicial pre-arrest delay in violation of his due process rights under the Pennsylvania and United States Constitutions.

In ***Commonwealth v. Scher***, 803 A.2d 1204 (Pa. 2002), ***cert. denied***, 538 U.S. 908 (2003), our supreme court clarified that:

> [I]n order to prevail on a due process claim based on pre-arrest delay, the defendant must first show that the delay caused him actual prejudice, that is, substantially impaired his or her ability to defend against the charges. The court must then examine all of the circumstances to determine the validity of the Commonwealth's reasons for the delay. Only in situations where the evidence shows that the delay was the product of intentional, bad faith, or reckless conduct by the prosecution, however, will we find a violation of due process. Negligence in the conduct of a criminal investigation, without more, will not be sufficient to prevail on a due process claim based on pre-arrest delay.

***Id.*** at 1221–1222 (footnote omitted).

In the present case, appellant claims that he was prejudiced by the delay in prosecution because it impaired his ability to formulate an alibi defense and because "memories have faded the accuracy of [the victim's] recollection which could have deteriorated by the time of trial." (Appellant's brief at 16.)

Specifically, appellant claims that the 29-month period from March 26, 2007, when the match on the CODIS database was found, until his arrest on August 20, 2009, constituted prejudicial delay. (*Id.* at 25.) Appellant argues this delay caused actual prejudice to his ability to mount a defense as he could no longer recall his whereabouts at the time of the crime or find any witness from the neighborhood. The victim passed away six months after he was arrested, and appellant did not have an opportunity to cross-examine her at the preliminary hearing or trial. (*Id.* at 25-16.) No relief is due.

The trial court found that appellant did not demonstrate the threshold showing of actual prejudice. (Trial court opinion, 8/2/13 at 8.) We agree. Appellant attempts to satisfy the actual prejudice threshold by alleging that the Commonwealth deprived him of an alibi defense as he could not, at the late trial date, recall his precise whereabouts and could not secure other evidence. This assertion falls substantially short of a demonstration of "actual prejudice." In fact, the vagueness of appellant's putative defense, which is devoid of any suggestion of what alibis might have been available during the period in question, renders his assertion of prejudice unconvincing.

We also agree with the Commonwealth that appellant's assertion that he was prejudiced by not having the opportunity to cross-examine the victim before she died is speculative. Appellant, who was in possession of the

statements the victim provided to the police, has not pointed to anything that he hoped to elicit from her in his defense. It is only where the defendant lost exculpatory evidence that prejudice is demonstrated.

Moreover, we agree with the court's finding that there was no intentional, bad faith, or reckless conduct by the prosecution relative to the pre-arrest delay in this case. Rather, "the delay in arresting [appellant] was caused by the necessary and proper investigatory steps." (Trial court opinion, 8/2/13 at 9.) We agree that the Commonwealth did not intentionally or negligently cause an unreasonable delay in arresting appellant.

Appellant's final claim also concerns an alleged violation of his right to a speedy trial. Appellant claims that the trial court erred by failing to dismiss the case pursuant to Pa.R.Crim.P. 600.

In evaluating Rule 600 issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. ***Commonwealth v. Hunt***, 858 A.2d 1234, 1238 (Pa.Super. 2004) (***en banc***). Furthermore:

> The proper scope of review . . . is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of the trial court. An appellate court must view the facts in the light most favorable to the prevailing party. Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be

> given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

*Id.* at 1238-1239 (internal citations and quotation marks omitted).

In the context of Rule 600, there is a distinction between "excludable time" and "excusable delay." Unlike "excludable time," "excusable delay" is not expressly defined in Rule 600, but the "legal construct takes into account delays which occur as a result of circumstances beyond the Commonwealth's control and despite its due diligence." *Hunt*, 858 A.2d at 1241.

If the Commonwealth attempts to bring a defendant to trial beyond the 365-day period prescribed by Rule 600, and the defendant files a Rule 600 motion to dismiss, the court must assess whether there is excludable time and/or excusable delay. *Id.* Even where a violation of Rule 600 has occurred, we recognize:

> The motion to dismiss the charges should be denied if the Commonwealth exercised due diligence and the circumstances occasioning the postponement were beyond the control of the Commonwealth.
>
> Due Diligence is a fact-specific concept that must be determined on a case-by-case basis. Due diligence does not require perfect vigilance and punctilious care, but rather a showing by the Commonwealth that a reasonable effort has been put forth.
>
> Reasonable effort includes such actions as the Commonwealth listing the case for trial prior to the

> run date to ensure that defendant was brought to trial within the time prescribed by Rule 600.

*Id.* at 1241-1242 (internal citations and quotation marks omitted) (emphasis omitted).

At the outset, we note our disagreement with appellant's primary contention; that is, that the Rule 600 run date commenced with the filing of the John Doe criminal complaint on January 25, 2002. (Appellant's brief at 33.) We agree with the Commonwealth that this argument is waived, as it was not raised at trial. Pa.R.A.P. 302(a). Moreover, pursuant to Pa.R.Crim.P. 600(C)(1), "the period of time between the filing of the written complaint and the defendant's arrest" is excluded where the Commonwealth acts with due diligence in determining his whereabouts. Here, the Commonwealth did not know appellant's name, had no physical description of the assailant, and did not received the CODIS hit information until March 26, 2007. The additional investigation needed to confirm appellant was an actual match was not completed until early August of 2009.

We find no error with either the trial court's decision or rationale. Following careful review, we affirm this issue based upon the trial court's opinion. (Trial court opinion, 8/2/13 at 3-7.) We also note that the record establishes that the victim's hospitalization prevented the Commonwealth from proceeding with the preliminary hearing; this circumstance was clearly beyond the control of the Commonwealth and constitutes excusable delay.

Judgment of sentence affirmed.

J. S38006/14

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/23/2014