J-S90019-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RAFAEL BRADSHEAR | |
| Appellant | No. 2633 EDA 2015 |

Appeal from the Judgment of Sentence Dated  August 13, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0010127-2014

BEFORE:  OTT, J., SOLANO, J., and JENKINS, J.

MEMORANDUM BY SOLANO, J.:          **FILED DECEMBER 30, 2016**

Appellant Rafael Bradshear appeals from the judgment of sentence imposed after he was convicted of aggravated assault, unlawful possession of a firearm, carrying a firearm without a license, and possession of an instrument of crime.[1]  We affirm.

The trial court summarized the facts of this case as follows:

> On July 22, 2014, Nabeel Din was sitting on his porch on Rorer Street in Philadelphia speaking with a friend [Ezequiel Lopez].  Sometime after 9:00 p.m., Din called [Appellant] and asked him for marijuana.  A short time later, [Appellant] approached Din, and the two started arguing.  [Appellant] was upset because Din asked [Appellant]'s mother where he could get marijuana earlier that evening.  [Appellant] and Din started fighting on the porch.  The fight continued down the street at the intersection of Tabor Road and Rorer Street.  [Appellant] removed a gun from his pocket and pointed the gun at Din's

---

[1]  18 Pa.C.S. §§ 2702, 6105, 6106, and 907.

head. Din grabbed the gun and [Appellant] pulled the trigger, firing a bullet over Din's left shoulder. Din and [Appellant] "tussled" for the gun, and during the struggle [Appellant] shot Din in the foot. Din immediately ran away from [Appellant]; Din eventually collapsed on the front lawn of a house on Rorer Street.

Trial Ct. Op., 12/3/15, at 1-2 (citations to the record omitted).

Lopez and his stepfather, Bladimil Ortiz, immediately called 911 to report the shooting. N.T. Trial, 6/9/15, at 84-85, 88, 128-29; 6/10/15, 131-32.[2] Officer Anthony Comitalo, who was on patrol that night, responded to a radio call about the incident. He found Din lying on the lawn in front of a house. Din had been shot in the ankle and was in severe pain. Din would not provide any information about the shooting to Officer Comitalo. Trial Ct. Op. at 2. Another officer suggested that Din had shot himself, and Din replied, "all right." Before he was placed in the ambulance, Din told the police that two men tried to rob him and then one of them shot him. Inside the ambulance, he provided physical descriptions of the alleged robbers. Trial Ct. Op. at 3; N.T. Trial, 6/9/15, at 166-69.

Detective Timothy Hartman also went to the crime scene to investigate the shooting. He recovered two .25 caliber fired cartridge casings from the intersection of Tabor Road and Rorer Street. Trial Ct. Op. at 2.

---

[2] The 911 call was played at the trial. N.T. Trial, 6/9/15, at 84-85. This recording is not in the certified record.

At the crime scene, Ortiz told police that he had information regarding the shooting and gave them his phone number. N.T. Trial, 6/10/15, at 47-49, 146-47. He later gave the police a surveillance video recording from his house, which showed the initial fight between Din and Appellant and the aftermath of the shooting, but did not show the shooting itself. *Id.* at 127-33.

Detective Robert Hassel called Ortiz the next day, and Ortiz provided descriptions of the shooter and a man who was with him at the time of the shooting, as well as their cell phone numbers. The number Ortiz provided for the shooter was Appellant's. The number he provided for Appellant's companion belonged to a man named Ryan Eitienne. N.T. Trial, 6/10/15, at 73, 105, 109; 6/11/15, at 13.[3]

On July 24, 2014, Ortiz gave a formal statement to a detective. Ortiz did not feel comfortable talking at his house, so he met the detective on the street about ten blocks away. Ortiz told the detective that on the night of the shooting, he was inside his house and saw Lopez walking up the street. Ortiz asked Lopez where he was going; Lopez responded that he was going with Din and there was going to be a fight. Ortiz told Lopez to come back, but Lopez refused. Ortiz walked to the front of the house, opened the door,

---

[3] A detective interviewed Eitienne and gave him a notice to appear in court on June 1, 2015, the day the trial was initially scheduled to begin. However, Eitienne did not appear, the trial was continued, and a bench warrant was issued. Eitienne could not be located for the trial. N.T., 6/10/15, at 72-80.

and heard gunshots. He saw the shooter run away. Ortiz identified Appellant as the shooter from a photo array and told police where Appellant lived. N.T. Trial, 6/10/15, at 106-07, 144-51; Ex. C-7. In his statement, Ortiz did not mention any conversation he had with Lopez regarding the identity of the shooter. *See* Ex. C-7.

On July 28, 2014, Lopez gave a statement to the police. He was initially reluctant to talk to the police, but said he eventually gave a statement because the police threatened to arrest him if he did not. In his statement, Lopez said that he was talking to Din when two men approached and started fighting with Din. The fight continued up the street, and one of the men shot Din. Lopez said he was "right next to" Din when Din was shot. Lopez told the police he did not recognize either of the men who approached Din. He described one man as black and wearing jeans. He did not provide a description of the other man. N.T. Trial, 6/9/15, at 96-107; Ex. C-9.

Din gave several statements to the police. At 10:50 p.m. on July 22, 2014, while he was in the hospital, Din gave a statement in which he said that he got into a fight with two men, and one of them shot him. He described the two men, but claimed he did not know them. Trial Ct. Op. at 3; Ex. C-12.

On July 24, 2014, while still in the hospital, Din gave a second police statement, in which he said that a man named Edwin had shot him. Trial Ct. Op. at 3; Ex. C-13. Because of the information they had received from Ortiz

- 4 -

that day, police suspected that Din had provided false information. Din was released from the hospital later that day. Shortly after he got home, the police went to his house, asked him to accompany them to the police station, and took a third statement from him there. N.T. Trial, 6/9/15, 176-79; 6/10/15, at 50-55.

In that third statement, Din identified Appellant as the shooter. Din explained that he had identified Edwin in his previous statement because he was upset with Edwin for implicating him in a robbery. Din said he had not identified Appellant earlier because he did not want any trouble. *See* Trial Ct. Op. at 3; N.T. Trial, 6/9/15, at 79; 6/10/15, at 55; Ex. C-14.

Based on the identifications by Din and Ortiz, detectives obtained a search warrant for Appellant's last known address: his grandmother's house at 5242 Rorer Street. The police executed the warrant the next day, July 25, 2014. In Appellant's grandmother's bedroom closet, they found a loaded .25 caliber semiautomatic handgun, sixty-two .25 caliber bullets of various brands, and materials commonly used to package marijuana. The gun was registered to Appellant's grandmother; after testing, the police excluded the gun as the weapon used in the shooting of Din. In the basement of the house, which was used as a bedroom, detectives found mail addressed to Appellant and male clothing. Trial Ct. Op. at 9-10; N.T. Trial, 6/10/15, at 56-68, 86.

Police also obtained a warrant for Appellant's cell phone records. Those records revealed the following calls on the night of the shooting: a call from Appellant to Eitienne at 9:15 p.m.; a call from Din to Appellant at 9:33 p.m.; a call from Appellant to his mother at 9:38 p.m.; several additional calls from Appellant to Eitienne between 9:36 and 9:51 p.m.; a call from Appellant to Din at 9:54 p.m.; and a call from Appellant to his mother at 10:04 p.m. N.T., 6/10/15, at 100, 107-14; Exs. C-35 and C-36.

An arrest warrant was issued for Appellant. On July 29, 2014, Appellant wrote on his Twitter[4] page, "It be the tuffest niggas ratting manee,"[5] and "This my last day out here." Appellant surrendered to the police that same day. Trial Ct. Op. at 11, N.T., 6/10/15, at 68-71; Ex. C-38. He was charged with attempted murder, aggravated assault, conspiracy, carrying a firearm without a license, unlawful possession of a firearm, and possessing an instrument of crime.

After Appellant's arrest, Din testified before a grand jury and identified Appellant as the man who shot him. He testified that he initially did not

---

[4] "Twitter" is a type of social media account. Messages posted on the service are known as "tweets." *See generally Nixon v. Hardin Cty. Bd. of Educ.,* 988 F. Supp. 2d 826, 830 n.1 (W.D. Tenn. 2013) (explaining how Twitter works).

[5] There is no definition or explanation of Appellant's use of the word "manee" in the record.

- 6 -

identify Appellant because he was afraid that if he did, someone in his family would get hurt. N.T. Trial, 6/9/15, at 180-81, 216-37; Ex. C-15.

Appellant was tried by a jury from June 9-12, 2015. During the trial, the Commonwealth was permitted to introduce Appellant's July 29, 2014 Twitter postings as evidence. N.T. Trial, 6/10/15, at 3-4, 70-71; Ex. C-38. Over Appellant's objection, the trial court ruled that it also would permit the Commonwealth to introduce evidence of the .25 caliber ammunition found in the closet of Appellant's grandmother. N.T. Trial, 6/9/15, at 3. The court asked Appellant and his counsel whether, in light of that ruling on the ammunition, they wanted introduction of evidence about the loaded .25 caliber gun that was found in the closet with the ammunition and the fact that police had determined that that gun was not used in the shooting of Din. Both Appellant and his counsel responded that they wanted that additional evidence regarding the gun admitted. *Id.* at 4-5. Thereafter, the Commonwealth elicited testimony from a detective regarding both the ammunition and the gun. *Id.* at 60-64.

At trial, Din identified Appellant as the person who shot him. N.T., 6/9/15, at 144-51, 184-85. He testified that he had not identified Appellant at first because he "ain't want no more problems" and "I thought that's it, it was over." *Id.* at 167. He hoped that when he told the police that he was robbed and did not know who did it, that "it was just going to go away" and "nobody was going to get locked up or nothing." *Id.* at 170. Din testified

that he concocted the story about Edwin because Din wanted to "get him back" for telling the police that Din had robbed him. *Id.* at 174. Din explained that he ultimately told the truth because he did not want to be arrested for giving false reports. *Id.* at 178-79.[6]

Lopez testified that, on the night of the shooting, he was outside with Din when two black men (who he said he did not know) approached Din. One of the men got into a verbal argument, and then a physical fight, with Din. Lopez tried to stop Din from fighting, but Din refused. Lopez testified that he heard gunshots but did not see the shooting. In contrast to what he told the police in his statement (in which he said he was "right next to" Din when Din was shot), Lopez testified at trial that he was about ten feet away from Din when Din was shot. Lopez testified that he did not remember much of his police statement, and he did not identify the shooter during the trial. He initially testified that he did not call 911, but when confronted with the recording of his call, he admitted that he had done so. When asked by the Commonwealth, "Did you tell your stepdad who you saw shoot?" Lopez testified that he did not. Trial Ct. Op. at 4; N.T. Trial, 6/9/15, at 68-84, 95-107.

Ortiz testified that, on the night of the shooting, he saw Appellant fighting with Din, but did not see the shooting. He had trouble remembering

---

[6] Din was later arrested for falsely implicating Edwin. N.T. Trial, 6/9/15, at 174.

what he had told the police, but he testified that he had identified Appellant as the shooter in his July 24, 2014 statement because he had seen Appellant fighting with Din and because Lopez told him that the man fighting Din was the shooter. N.T. Trial, 6/10/15, at 134-150; 6/11/15, at 4-15. Ortiz's testimony about what Lopez told him about the identity of the shooter contradicted Lopez's prior testimony that he had not made such a statement to Ortiz. Appellant objected to Ortiz's testimony on this issue, but the objection was overruled. *Id.* at 135. Appellant did not then move for a mistrial or request a limiting instruction. *See id.*

After Ortiz testified, he revealed that a man in the courtroom called him a "snitch" as he was taking the stand on the second day of his testimony. Ortiz said that the man continued to look at him and moved his mouth without saying anything aloud during Ortiz's testimony and continued to look at Ortiz after Ortiz left the witness stand. Ortiz said he told the man, "I don't worry about you." Ortiz maintained that his testimony was not affected by this interaction. Over Appellant's objection, the trial court allowed the Commonwealth to recall Ortiz as a witness to testify about this incident, and also to call an assistant district attorney who had witnessed what happened in the courtroom. N.T. Trial, 6/11/15, at 43-55.

At the conclusion of all trial testimony, Appellant moved for a mistrial. He argued that Ortiz's testimony was "filled with hearsay from his son, inadmissible hearsay, that a curative instruction of any kind [telling] the jury

to only regard that evidence as to whether or not the son Mr. Lopez made a consistent or inconsistent statement would be inadequate." N.T. Trial, 6/11/15, at 60-61. The trial court denied the motion for a mistrial, but gave the following limiting instruction to the jury:

> You heard the testimony regarding alleged conversations between Mr. Bladimil Ortiz and Ezequiel Lopez regarding the alleged identity or description of the shooter. That testimony was admitted for a limited purpose, that is to evaluate the weight and credibility of Mr. Lopez's testimony. You may not regard that evidence as proof of the truth of anything asserted in those statements.

N.T. Trial, 6/11/15, at 62, 130-31.

On June 12, 2015, the jury found Appellant guilty of aggravated assault, carrying a firearm without a license, and possessing an instrument of crime. The jury found Appellant not guilty of attempted murder. Based upon the evidence submitted to the jury and a stipulation that Appellant had a prior felony adjudication, the trial court found Appellant guilty of unlawful possession of a firearm. On August 13, 2015, the trial court imposed a sentence of 7-14 years' incarceration for aggravated assault and a concurrent sentence of 3-6 years' incarceration for carrying a firearm without a license.

In this appeal, Appellant raises the following issues, as stated in his brief:

> 1. Was the evidence insufficient to support the verdict, where nobody but the complainant testified to having witnessed the shooting, and where the complainant's testimony was so incredible that it may not support a verdict beyond a reasonable

- 10 -

doubt, as it was only in his fourth version of events that he named the appellant at all (in his third version, he falsely named a man named Edwin as the shooter, **see** N.T. 6.9.15, p. 173; in his second version, he said it was two men trying to rob him, **see id.** at 168; in his first version, given to first responders before he had had time to formulate a lie, the police said that he shot himself and he agreed, **see id.** at 165-66)?

2.    Was admission of the .25 caliber ammunition found in the appellant's grandmother's house in her bedroom (N.T. 6.9.15, p. 3), an abuse of discretion where such evidence was more prejudicial than probative, given that the .25 caliber handgun also found in the appellant's grandmother's room (which was on a different floor from the appellant's basement room where he slept and where his mail was found) was a small gun of the type that are commonly marketed to women, and was properly registered to her and was clearly her property, and had nothing to do with the appellant?

3.    Was admission of two postings from social media an abuse of discretion where such postings were more prejudicial than probative, and were not relevant (**see** N.T. 6.10.15, pp. 3-4)?

4.    Was admission of testimony that a member of the audience called a witness a "snitch" an abuse of discretion where such testimony was highly prejudicial to the appellant but was not probative, as the witness in question testified under oath that the incident did not affect his testimony at all (N.T. 6.11.15, pp. 35-36), and there was no evidence that the appellant caused the member of the audience to act out?

5.    Was denial of the appellant's mistrial motion (N.T. 6.11.15, pp. 59-62) an abuse of discretion?

Appellant's Brief at 4-5.

## Sufficiency of the Evidence

First, Appellant claims that the evidence was insufficient to support the verdict.[7]  In reviewing this issue, we apply the following standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. DiStefano***, 782 A.2d 574, 582 (Pa. Super. 2001) (internal quotation marks, brackets, and citations omitted), ***appeal denied***, 806 A.2d 858 (Pa. 2002).

_____

[7]  The trial court held, and the Commonwealth argues in its brief, that Appellant waived his sufficiency claim because Appellant's Pa.R.A.P. 1925(b) statement did not challenge a particular conviction or a specific element of any particular conviction.  Trial Ct. Op. at 5-6; Commonwealth's Brief at 10-12.  We conclude, however, that Appellant's Rule 1925(b) statement, which phrased the sufficiency issue almost exactly as Appellant does in his Statement of Questions Involved, was adequate to preserve the issue.

While issues of credibility are generally the sole province of the trier of fact, Appellant relies on an exception to that general rule for "testimony [that] is so inherently unreliable that a verdict based upon it could amount to no more than surmise or conjecture." Appellant's Brief at 15; *see* ***Commonwealth v. Smith***, 467 A.2d 1120, 1122 (Pa. 1983). This Court applied this exception in ***Commonwealth v. Bennett***, 303 A.2d 220 (Pa. Super. 1973). The defendant in that case had been convicted of receiving stolen property (a car) on the basis of inconsistent testimony by an accomplice named Jones. In finding Jones' testimony insufficient to support the conviction, we explained:

> Jones (who had been contradictory with respect to his own perpetration of the larceny) sought to implicate the defendant by giving several wholly different, conflicting and inconsistent versions of when and how he had told her that the car had been in fact stolen by him. On a previous occasion Jones had denied he had ever conveyed to defendant knowledge of the car's theft. With each new version Jones would recant the previous one and protest that the newest version was in fact the true one. This situation presented the jury not with a mere conflict or contradiction in testimony which was reasonably reconcilable by them, but a situation falling within the rule: . . . a case should not go to the jury where the party having the burden offers testimony of a witness, or of various witnesses, which is so contradictory on the essential issues that any finding by the jury would be a mere guess . . . . When the testimony is so contradictory on the basic issues as to make any verdict based thereon pure conjecture the jury should not be permitted to consider it.

*Id.* at 220-21 (quotation marks and citation omitted).

Twenty years later, the Supreme Court applied this principle in ***Commonwealth v. Karkaria,*** 625 A.2d 1167, 1172 (Pa. 1993), in which it

overturned a conviction on multiple charges of rape because it was "not based on anything more than speculation and conjecture." The Court noted numerous "critical inconsistencies" in the record: (1) the complainant initially reported only that the defendant (her stepbrother) "touched" her, not that he penetrated her; (2) she initially "was unable to offer sufficient testimony as to the material elements of the crime of rape," causing the District Attorney to decline to prosecute; (3) her initial reports were made when her mother was reconciling with the defendant's father, whom she hated; (4) her testimony regarding when the rapes occurred was "disturbingly vague"; (5) she "insisted that the assaults only occurred when [the defendant] was babysitting and yet she also admitted that during the time period charged in the indictment [the defendant] no longer acted as the babysitter"; and (6) she described only one specific incident of rape, which occurred years before the time period charged in the indictment, and offered only one scenario for each of 300 alleged incidents of sexual assault. *Id.* at 1171. The Court concluded that the evidence presented at trial was "so unreliable and contradictory that it is incapable of supporting a verdict of guilty, and thus, [was] insufficient as a matter of law." *Id.* at 1172.

The Supreme Court has explained that this principle "is applicable only where the party having the burden of proof presents testimony to support that burden which is either so unreliable or contradictory as to make any verdict based thereon obviously the result of conjecture and not reason."

*Commonwealth v. Galloway*, 434 A.2d 1220, 1222 (Pa. 1981) (quoting *Commonwealth v. Farquharson*, 354 A.2d 545, 550 (Pa. 1976)). In this connection, the Court has made clear that evidence is not insufficient simply because witnesses make inconsistent statements. Thus, for example, in *Commonwealth v. Brown*, 52 A.3d 1139 (Pa. 2012), the Court held that out-of-court statements by three witnesses who identified the defendant as the perpetrator provided sufficient evidence to support a guilty verdict even though they were later recanted at trial. 52 A.3d at 1144-48, 1171. The Court explained:

> Even when there are well recognized concerns regarding the reliability of evidence, such as in instances where evidence of guilt is provided by a criminal accomplice who is deemed a corrupt and polluted source, our Court has not categorically regarded all such evidence to be so inherently unreliable that it cannot, by itself, support a verdict of guilt. Instead, our Court considers questions regarding the reliability of the evidence received at trial to be within the province of the finder-of-fact to resolve, and our Court will not, on sufficiency review, disturb the finder-of-fact's resolution except in those exceptional instances . . . where the evidence is so patently unreliable that the jury was forced to engage in surmise and conjecture in arriving at a verdict based upon that evidence.

*Id.* at 1165 (citations omitted). The Court noted that cross-examination "furnishes the best method by which the witness's motives for changing his or her story, from that given previously, may be fully and thoroughly explored." *Id.* at 1169.

In addition, the Supreme Court has held that the testimony of a witness who had a criminal record and was reluctant to implicate the

- 15 -

defendant can be sufficient to support a verdict. *See Commonwealth v. Hudson*, 414 A.2d 1381, 1385-86 (Pa. 1980). In *Hudson*, the Court held that the testimony of two witnesses was not "patently unreliable," although the witnesses (1) may have been intoxicated when defendant admitted the crimes to them; (2) had criminal records; (3) denied knowledge of the defendant at first; and (4) assisted the defendant after he committed the crimes. *Id.* The Court explained:

> [N]either inconsistencies in the Commonwealth's evidence nor attempts by [a witness] to avoid involvement in a criminal episode render his testimony patently unreliable under the *Farquharson* standard. The fact that [a witness] initially gave inconsistent statements to the police is a matter for the jury in determining his credibility. [A witness's] prior crimes are also matters going to his credibility and issues of credibility are properly resolved by the trier of fact.

*Id.* at 1385 (citations omitted).

Here, relying on *Bennett* and *Karkaria,* Appellant claims that the evidence was insufficient to support his conviction because the Commonwealth "cannot establish that the Appellant introduced the gun or tried to shoot Din without Din's own testimony, which is utterly incredible." Appellant's Brief at 15. Appellant emphasizes Din's first two statements to the police, in which he did not identify Appellant as the shooter, as well as Din's criminal record. *Id.* at 15-16.[8]

---

[8] At trial, Din testified that he was serving a five to ten year sentence of imprisonment for burglary and had previously been convicted of theft twice. *(Footnote Continued Next Page)*

We disagree. Unlike **Karkaria** and **Bennett**, this case does not involve such "exceptional" circumstances, **see Brown**, 52 A.3d at 1165, as would require this Court to disregard the jury's findings about the credibility of the evidence identifying Appellant as the shooter. Unlike the complainant in **Karkaria**, Din was clear about when the crime occurred. Din also explained why he had given prior inconsistent statements. He asserted that he did not identify anyone at first because he did not want to cause more problems for himself and he hoped the problem would just go away. N.T. Trial, 6/9/15, at 167, 170. He testified that he identified Edwin because he was angry that Edwin had implicated him in a robbery. **Id.** at 172-74. Further, he said that he ultimately told the truth and identified Appellant when faced with the possibility of being charged with making false statements to the police. **Id.** at 178-79. Once he identified Appellant as the shooter, Din again identified him before the grand jury and at trial. **Id.** at 184-85, 216-37. Neither Din's prior inconsistent statements nor Din's criminal record rendered his testimony so unreliable that it could not support the verdict. **See Hudson**, 414 A.2d at 1385-86. The jurors were aware of the relevant facts and

_(Footnote Continued)_ ⸻

N.T., 6/9/15, at 136-37. Appellant attached to his brief a summary of Din's criminal record. Because this summary is not part of the certified record and contains information that is not otherwise in the record, we will disregard it. **See Commonwealth v. Holley**, 945 A.2d 241, 246 (Pa. Super.) ("'[f]or purposes of appellate review, what is not of record does not exist' . . .[, and] copying material and attaching it to a brief does not make it a part of the certified record" (internal citations omitted)), **appeal denied**, 959 A.2d 928 (Pa. 2008).

inconsistencies, and it was within their province to assess Din's credibility. *See id.*

Moreover, unlike in *Karkaria* and *Bennett*, other evidence corroborated Din's account of the crime. Ortiz testified that he saw Appellant fighting with Din shortly before the shooting. N.T., 6/11/15, at 4. Phone records corroborated Din's testimony that he called Appellant shortly before the shooting. N.T., 6/9/15, at 143-44; 6/10/15, at 111. The phone records also showed calls between Appellant and the number Ortiz identified as belonging to the man who accompanied Appellant on the night of the shooting. N.T., 6/10/15, at 111-12. In sum, we hold that the evidence, when viewed in a light most favorable to the Commonwealth, was sufficient to support the jury's verdict.

## Evidentiary Rulings

In his second, third, and fourth issues, Appellant challenges evidentiary rulings made by the trial court. Our standard of review for these claims is deferential:

> The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Woodard*, 129 A.3d 480, 494 (Pa. 2015) (quotation marks and citations omitted), *cert. denied*, 137 S. Ct. 92 (2016).

In general, all relevant evidence is admissible. Pa.R.Evid. 402. Evidence is relevant if "it has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Pa.R.Evid. 401. "[T]he threshold for relevance is low due to the liberal '*any* tendency' prerequisite." **Brady v. Urbas**, 111 A.3d 1155, 1162 (Pa. 2015) (emphasis in original; citing Pa.R.Evid. 401). Relevant evidence may be excluded, however, if its probative value is outweighed by, among other things, a danger of unfair prejudice. Pa.R.Evid. 403. "Evidence is not unfairly prejudicial simply because it is harmful to the defendant's case. Rather, exclusion of evidence on this ground is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." **Commonwealth v. Foley**, 38 A.3d 882, 891 (Pa. Super. 2012) (internal quotation marks and citations omitted), **appeal denied**, 60 A.3d 535 (Pa. 2013).

<u>The .25 Caliber Ammunition</u>

Appellant claims that the trial court erred in admitting evidence of the sixty-two live rounds of .25 caliber ammunition found in a closet in the house where he and his grandmother lived. Also found in the closet was a loaded .25 caliber handgun that police determined was not used in the shooting of Din. After the trial court admitted evidence of the ammunition over Appellant's objection, Appellant elected to have evidence of the gun introduced. N.T. Trial, 6/10/15, at 4-5. Appellant now argues that it was

error to admit evidence of the ammunition because that evidence was more prejudicial than probative.

Much of Appellant's argument on this issue deals with the so-called "similar weapon exception." **See** Appellant's Brief at 18-22. That exception recognizes that, although a weapon not "specifically linked" to the charged crime is usually inadmissible, evidence about the weapon may be admitted "if the Commonwealth lays a foundation that would justify an inference by the finder of fact of the likelihood that the weapon was used in the commission of the crime." **Commonwealth v. Christine**, 125 A.3d 394, 396 n.4 (Pa. 2015) (internal quotation marks and citation omitted). "The theory of the exception is that the weapon possessed could have been the weapon used [in the crime]," and "[a]ny uncertainty that the weapon is the actual weapon used in the crime goes to the weight of such evidence," rather than its admissibility. **Id.** at 400 (citation omitted); **see Commonwealth v. Owens**, 929 A.2d 1187, 1191 (Pa. Super.) (where handguns involved in shooting were never recovered, handgun parts and ammunition found in home of defendant were "relevant as tending to prove that the defendants had weapons similar to the ones used in the perpetration of the crime"), **appeal denied**, 940 A.2d 364 (Pa. 2007).[9] In

_____

[9] In **Christine**, the Court criticized our description of the similar weapons exception in **Owens** because it "omitted language referring to the need for a foundation justifying an inference the weapon was used in the crime." *(Footnote Continued Next Page)*

*Christine*, the Court stressed that the similar weapon exception does not apply simply because the weapon at issue was *similar* to the weapon used in the crime; there must be a foundation that would justify the inference that the weapon could have been the one used in the crime. *Christine*, 125 A.3d at 400-01.

Appellant argues that the .25 caliber ammunition recovered from his and his grandmother's house was not admissible under the similar weapon exception because the Commonwealth's showing that the caliber of the ammunition was the same as that used in the crime was inadequate under *Christine*. Appellant's Brief at 20. He notes that the ammunition found in the house was not the same brand as the shells recovered at the crime scene. *Id.*

We disagree. Because the ammunition was of the same caliber as that found at the crime scene, it was relevant, as it tended to make it more probable that Appellant possessed the gun used in the shooting. *See* Trial Ct. Op. at 10; Pa.R.Evid. 401. The similar *weapon* exception does not directly fit these facts because the evidence at issue is ammunition, not a weapon. This case is distinguishable from *Christine*, where the weapon at issue could not possibly have been the one used in the assault. *See*

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

*Christine*, 125 A.3d at 400 n.10. However, the Court did not overrule the holding of *Owens*.

- 21 -

*Christine*, 125 A.3d at 400. Here, although the .25 caliber handgun found with the ammunition was found to not be the gun used to shoot Din, it cannot be said that the .25 caliber ammunition could not be used in the gun that was used in the crime. Although the ammunition was not the same brand as the shells recovered at the crime scene, it could fit in any .25 caliber weapon, including the weapon used in the assault. N.T. Trial, 6/10/15, at 94.

For this same reason, this case is distinguishable from *Commonwealth v. Stokes*, 78 A.3d 644 (Pa. Super. 2013), *appeal denied*, 89 A.3d 661 (Pa. 2014). In *Stokes*, this Court held that the trial court erred in admitting ammunition found in the defendant's home, where that ammunition was of a different caliber than that used in the crime. *Id.* at 655. We determined that to the extent the ammunition from the defendant's home was relevant at all, its probative value was outweighed by the potential for unfair prejudice, although we then concluded that the error in admitting the ammunition was harmless because of the overwhelming evidence of the defendant's guilt. *Id.* at 656. Here, because the ammunition was of the same caliber as that of the weapon used in the crime, the ammunition was relevant evidence.

Appellant contends that the Commonwealth did not prove that he had access to the ammunition, which was in his grandmother's bedroom closet. Appellant's Brief at 21. But there was no evidence that the room or closet

was locked. Thus, because Appellant lived in the house, the jury could infer that he had access to the ammunition. *See Commonwealth v. Carroll*, 507 A.2d 819, 821 (Pa. 1986) (evidence was sufficient for the jury to conclude that a husband had constructive possession of drugs found in woman's pants in a hotel room he rented with his family);[10] *Commonwealth v. Aviles*, 615 A.2d 398, 403 (Pa. Super. 1992) (factfinder could conclude that lessee and sub-lessees had access to all bedrooms and entire residence), *cert. denied*, 513 U.S. 819 (1994).

We do not agree that the trial court abused its discretion in concluding that the danger of unfair prejudice did not outweigh the probative value of the ammunition evidence. Appellant argues that the ammunition evidence was particularly prejudicial because of its "sheer bulk" and the fact that it was found with a .25 caliber gun. Appellant's Brief at 20. But we do not see how the amount of ammunition by itself would "inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." *See Foley*, 38 A.3d at 891; *Owens*, 929 A.2d at 1191. Further, Appellant waived any argument that the admission of the gun found with the ammunition increased the prejudice when he agreed that the Commonwealth could introduce the gun after the court ruled that it would

_____

[10] We may cite cases predating the enactment of the Pennsylvania Rules of Evidence to the extent they are in accord with the Rules. *Commonwealth v. Aikens*, 990 A.2d 1181, 1185 n.2 (Pa. Super. 2000).

admit the ammunition. *Cf. Commonwealth v. Beasley*, 479 A.2d 460, 463 (Pa. 1984) (defendant cannot claim evidence was improperly admitted when he introduced it).

In sum, we hold that the trial court did not abuse its discretion in finding that the ammunition was relevant and not unfairly prejudicial.

Appellant's Social Media Postings

Next, Appellant claims that the trial court abused its discretion in admitting evidence of his Twitter postings. Approximately one week after the shooting, and hours before he surrendered to the police, Appellant tweeted, "it be the tuffest niggas ratting manee" and "this my last day out here." N.T. Trial, 6/10/15, at 68-71, 96; Ex. C-38. Appellant concedes that he "used a street word for witness – rat – that is often used in the context of threats." Appellant's Brief at 23. He argues, however, that his posting expressed only surprise that someone who is "tough" would cooperate with the Commonwealth. *Id.* Appellant argues that the postings were more prejudicial than probative and were not relevant. Appellant's Brief at 22.[11] The trial court concluded that the postings were probative of Appellant's consciousness of guilt and were not unfairly prejudicial. Trial Ct. Op. at 11.

Separate and apart from whatever implication of a threat may be inferred from Appellant's tweet, there is no question that Appellant's use of

_____

[11] Appellant did not challenge the authenticity of the postings at trial, and he does not do so on appeal. Trial Ct. Op. at 11 n.5.

the word "ratting" suggested that Appellant believed someone spoke to the police and implicated him in the crime. As Appellant acknowledges, the tweet reflected an "anti-snitching sentiment," Appellant's Brief at 24, which shows his belief that someone identified him as Din's shooter. Appellant argues that his characterization of that person as a "rat" or snitch did not necessarily reflect an admission that the information given to the police about Appellant's involvement in the crime was correct. He explains, "the terms 'ratting' and 'snitching' are not only used to refer to people who tell the truth to the police — they are also used to describe people like Nabeel Din, who lie to the police, leading them to arrest an innocent party (such as Edwin, the man that Din named as the shooter just prior to naming the Appellant, and such as the Appellant himself))." *Id.* But resolution of any ambiguities in Appellant's tweet was for the jury, which was free to interpret the statement as an acknowledgment that someone had informed the police of a crime he committed. Under that interpretation, the tweet had probative value.

To the extent that the word "ratting" suggested a possible threat, the tweet was also admissible to show possible consciousness of guilt. *See Commonwealth v. Raymond Johnson*, 838 A.2d 663, 680 (Pa. 2003), *cert. denied*, 543 U.S. 1008 (2004). In *Raymond Johnson*, before his trial, the defendant approached a witness and said, "Its' [*sic*] kind of f___ed up when people's families die." 838 A.2d at 679 (letters omitted in original).

The defendant argued that the statement was not admissible because "it [was] not clear that the comments were intended as a threat." *Id.* at 680. The Court held that regardless of whether the defendant's words constituted a threat, they were admissible because they were intended to influence the witness' testimony. *Id.*

Whether Appellant's postings actually communicated a threat was a question of interpretation that was properly left to the jury. In *Commonwealth v. Kramer*, 371 A.2d 1008 (Pa. Super. 1977), the defendant's letter to his wife stating, "(w)hen I get out of here, I am going to get a gun and you know what I am going to do," was admissible even though the defendant said he merely was referring to hunting. The true meaning of the statement was within the province of the jury. 371 A.2d at 1011-12. Here, the jury could have inferred that Appellant used word "ratting" with the intent to intimidate, and the Twitter postings therefore were relevant and admissible. *See Raymond Johnson*, 838 A.2d at 680. Moreover, we conclude that the trial court did not abuse its discretion in finding that "the messages were not unfairly prejudicial as they did not divert the jury's attention away from its duty of weighing the evidence impartially." Trial Ct. Op. at 11 (quotation marks and citation omitted).

<u>Ortiz's Interaction with a Courtroom Audience Member</u>

Appellant next claims that the trial court abused its discretion by admitting evidence that a man in the courtroom audience called Ortiz a

snitch immediately before his second day of testimony and stared at Ortiz as he testified. Appellant argues that evidence of this interaction was highly prejudicial and not probative. Appellant's Brief at 25.

"In general, 'threats by third persons against . . . witnesses are not relevant [and thus not admissible into evidence] unless . . . the defendant is linked in some way to the making of the threats.'" *Commonwealth v. Bryant*, 462 A.2d 785, 788 (Pa. Super. 1983) (quoting *Commonwealth v. Carr*, 259 A.2d 165, 167 (Pa. 1969)). This general rule "refers to the relevance of a threat as it bears upon the issue of guilt." *Carr*, 259 A.2d at 167; *accord Commonwealth v. Ragan*, 645 A.2d 811, 824 (Pa. 1994). However, a threat by a third party is admissible for other purposes apart from proving guilt; these include explaining a witness's prior inconsistent statement. *Carr*, 259 A.2d at 167; *Bryant*, 462 A.2d at 788.

In *Carr*, the Court held that threats by an identified third party were relevant and admissible to explain why a witness wrote a letter exonerating the defendant. *Carr*, 259 A.2d at 167. The Court held that "there was no danger that the jury would treat the threat explanation as relevant to [the defendant's] guilt" because someone else had been identified as having made the threat. *Id.* The Court further noted that if the defendant was concerned that the jury might consider the threat relevant to the issue of his guilt, he could have requested a cautionary instruction. *Id.*

In ***Commonwealth v. Clarence Johnson***, 615 A.2d 1322 (Pa. Super. 1992), ***appeal denied***, 625 A.2d 1191 (Pa. 1993), this Court held that evidence of threats received by a witness and his mother were admissible "as evidence of the witness' state of mind, bias and reason for testifying." 615 A.2d at 1334. Noting that the jury was specifically instructed not to consider the threats as evidence of the defendants' guilt, the Court in ***Clarence Johnson*** held that the trial court did not abuse its discretion in admitting the evidence. ***Id.*** at 1335.

Here, the threatening behavior of an audience member towards Ortiz was not admitted as evidence proving Appellant's guilt. Rather, the trial court explained that it admitted the evidence to assist the jury in assessing Ortiz's credibility. ***See*** Trial Ct. Op. at 13. Ortiz had made a prior inconsistent statement in which he said he saw the shooter, and he had difficulty recollecting what he had previously told the police. His credibility was in issue, and the evidence of the threat was relevant to assist the jury in assessing that credibility. ***See Clarence Johnson***, 615 A.2d at 1334.[12]

Moreover, Appellant was not unfairly prejudiced by Ortiz's testimony regarding the threat. First, Ortiz testified that Appellant did not make the

---

[12] Although Ortiz testified that the threat did not affect his testimony, the jury was free to accept or reject this assertion. ***See Commonwealth v. Baez***, 759 A.2d 936, 939 (Pa. Super. 2000) ("it is for the fact finder to make credibility determinations, and the finder of fact may believe all, part, or none of a witness's testimony"), ***appeal denied***, 775 A.2d 800 (Pa. 2001).

threat. *See* N.T. Trial, 6/11/15, at 51; *Carr*, 259 A.2d at 167 (defendant not prejudiced where threat was made by identified third party). Further, the trial court instructed the jury to consider the testimony only for the purpose of evaluating the credibility and weight of Ortiz's testimony. N.T., 6/11/15, at 131. The jury is presumed to have followed the court's instruction. *See Commonwealth v. Hairston*, 84 A.3d 657, 666 (Pa.), *cert. denied*, 135 S.Ct. 164 (2014).

In sum, we hold that the trial court did not abuse its discretion in determining that evidence Ortiz was threatened before he testified was admissible for the purpose of assessing Ortiz's credibility and was not unfairly prejudicial.

## Denial of Motion for a Mistrial

Appellant's final claim is that the trial court abused its discretion by denying his motion for a mistrial, which was based on alleged hearsay in Ortiz's testimony — specifically, Ortiz's testimony that Lopez told him that the shooter was the man Ortiz had seen fighting with Din.

In reviewing this claim, we apply the following principles:

The trial court is in the best position to assess the effect of a prejudicial statement on the jury. Thus, the decision of whether to grant a mistrial is within the sound discretion of the trial court, and will not be reversed on appeal absent an abuse of that discretion. The remedy of a mistrial is an extreme one that is required only when an incident is of such a nature that its unavoidable effect is to deprive the defendant of a fair and impartial trial by preventing the jury from weighing and rendering a true verdict. Furthermore, a mistrial is not necessary

if a court's cautionary instructions adequately cure any prejudice.

***Commonwealth v. Begley***, 780 A.2d 605, 624–25 (Pa. 2001) (citations omitted).

Appellant's mistrial motion was based on his assertion that "Mr. Ortiz's testimony [was] filled with hearsay from his son," Lopez, regarding the identity of the shooter. N.T. Trial, 6/11/15, at 60. Although Appellant objected when Ortiz testified that Lopez told him Appellant had shot Din, Appellant did not state the basis for his objection,[13] or request a mistrial or a limiting instruction at that time. ***See*** N.T., 6/10/15, at 134-35. Indeed, he did not move for a mistrial until the end of the trial — the next day — **after** all evidence had been presented and **after** he had unsuccessfully moved for

---

[13] Rule 103(a) of the Rules of Evidence states:

A party may claim error in a ruling to admit . . . evidence only:

(1)  if the ruling admits evidence, a party, on the record:

(A)  makes a timely objection, motion to strike, or motion *in limine*; and

(B)  states the specific ground, unless it was apparent from the context . . . .

Here, Appellant did not state whether he objected because Ortiz's testimony contained hearsay inadmissible under Evidence Rules 802 and 803, or because the testimony's probative value would be outweighed by the prejudice it could cause under Rule 403, or for some other reason. In his brief to this Court, Appellant cites only to Rule 802. Appellant's Brief at 29.

judgment of acquittal on all charges.[14] At that point, Appellant contended "that a curative instruction of any kind" would be inadequate. N.T. Trial, 6/11/15, at 60-61. Appellant also explained that he had been unable to effectively cross-examine Lopez regarding what Ortiz said Lopez told him because Lopez testified before Ortiz gave that testimony. *Id.* at 61.

The Commonwealth responded that Ortiz's testimony regarding what Lopez told him was introduced to impeach Lopez's prior testimony that he did not tell his father who the shooter was. On this basis, the Commonwealth argued that the question to Ortiz about what Lopez told him was proper impeachment testimony, and it told the court that a limiting instruction explaining that purpose would avoid any prejudice to Appellant. The Commonwealth also asserted that Appellant could have recalled Lopez if he wanted to examine him about Ortiz's testimony. N.T. Trial, 6/11/15, at 61-62.

The trial court denied Appellant's motion for a mistrial, but instructed the jury that the testimony was admitted for "a limited purpose, that is to evaluate the weight and credibility of Mr. Lopez's testimony." *Id.* at 130-31. It added, "You may not regard that evidence as proof of the truth of anything asserted in those statements." *Id.* at 131. Appellant agreed that the wording of that instruction was appropriate. *Id.* at 62.

---

[14] The trial court granted the motion for judgment of acquittal on two counts of conspiracy, and denied it on the other charges.

In his brief to this Court, Appellant now asserts:

> The trial court erred and abused its discretion in denying the Appellant's motion for mistrial based on the admission of hearsay testimony through Bladimil Ortiz's trial testimony. . . . Ortiz initially indicated that he had seen the shooting, but under oath acknowledged that he had not because he was inside his house when the shooting occurred. The information that he gave the police on the night of the shooting purportedly came from his son, but under oath his son also testified that he had not seen the shooting. This is core hearsay.

Appellant's Brief at 28-29.  Appellant continues:

> [T]he Commonwealth was caught flat-footed when their witnesses [Ortiz and Lopez] came to court and acknowledged under oath that they knew a lot less than they had purported to know when they gave their statements.  Ortiz thought he "knew" what his son had told him, and his son, a teenager when the shooting occurred, engaged in some "puffery" about standing with Din and being near him when shot.

*Id.* at 29-30.  Appellant argues that the alleged hearsay in Ortiz's testimony reflected an attenuated and prejudicial "'on the street' understanding" of what happened at the shooting.  *See id.* at 29-30.  He contends that "allowing in testimony that amounts to 'street knowledge' (i.e. gossip) has the potential to give the jury the message that 'everybody knows' who committed a certain shooting . . . ."  *Id.* at 30.  He also makes two arguments that he did not raise before the trial court, specifically that the "prior inconsistent statement" instruction was inadequate because (1) a written copy of the instruction was not given to the jury, and (2) the charge was not given immediately after the "prior inconsistent statement" testimony.  *Id.*

We will not address the arguments in Appellant's brief regarding the timing of the charge or the fact that the jury was not given a written copy of it, because Appellant did not raise those issues before the trial court. *See Commonwealth v. Duffy*, 832 A.2d 1132, 1136 (Pa. Super. 2003) ("an appellant may not raise a new theory for an objection made at trial on his appeal"), *appeal denied*, 845 A.2d 816 (Pa. 2004). We further note that the issue framed for us by Appellant — "Was denial of the appellant's mistrial motion (N.T. 6.11.15, pp. 59-62) an abuse of discretion?," Appellant's Brief at 5 — is not whether the trial court erred in overruling Appellant's objection during Ortiz's testimony, but rather the distinct issue whether the trial court erred in denying the motion for a mistrial Appellant made at the conclusion of the trial. Even though Appellant's brief challenges the propriety of three of the trial court's evidentiary rulings (on admissibility of the ammunition evidence, tweets, and the alleged courtroom threat), the ruling admitting Ortiz's testimony is not among them. After reviewing the record, the parties' briefs, and the trial court opinion, we conclude that the trial court did not abuse its discretion in denying the "extreme" remedy of a mistrial. *See Begley*, 780 A.2d at 624-25.

Although Appellant objected to the admission of Ortiz's testimony that Lopez identified the shooter, he did not state a basis for the objection at that time, and he did not then move for a mistrial or request any limiting instruction to the jury regarding the testimony. It was not until the next

day, after the close of all evidence and after the trial court had denied the bulk of Appellant's motion for acquittal, that Appellant argued for the first time that because Ortiz's testimony was "filled with . . . inadmissible hearsay," a mistrial was required. N.T. Trial, 6/11/15, at 60-61. The trial court then explained that it had admitted the testimony only for the limited purpose of assisting the jury in its assessment of Lopez's credibility, and, although it denied the mistrial, it instructed the jury not to consider the evidence as proof of anything asserted in the conversation. *See* Trial Ct. Op. at 15; N.T. Trial, 6/11/15, at 130-31. In doing so, the trial court did not err.

First, as the trial court held, Ortiz's testimony qualified as extrinsic evidence of a prior inconsistent statement by Lopez about whether he had told his father the identity of the shooter, and it therefore was admissible to permit assessment of Lopez's credibility. It is axiomatic, of course, that hearsay — "an out-of-court statement, which is offered in evidence to prove the truth of the matter asserted," *Commonwealth v. Busanet*, 54 A.3d 35, 68 (Pa. 2012), *cert. denied*, 134 S.Ct. 178 (2013) — is inadmissible unless a specific exception to the hearsay rule applies. *See id.* (citing Pa.R.Evid. 802). However, "[a]n out-of-court statement is not hearsay when it has a purpose other than to convince the fact finder of the truth of the statement," *id.*, and, in particular, it may be admitted for purposes of impeachment. *See* Pa.R.Evid. 803.1(1) cmt. ("An inconsistent statement of a witness that

- 34 -

does not qualify as an exception to the hearsay rule may still be introduced to impeach the credibility of the witness"); *Commonwealth v. Charleston*, 16 A.3d 505, 526-27 (Pa. Super.), *appeal denied*, 30 A.3d 486 (Pa. 2011), *abrogated on other grounds by In re L.J.*, 79 A.3d 1073 (Pa. 2013). Notably, although Appellant asserts that Ortiz's testimony contained "core hearsay," Appellant's Brief at 29, Appellant does not address the admissibility of such testimony for the purpose of impeachment and does not contend that Ortiz's testimony was inadmissible for that purpose here.[15]

In *Charleston*, this Court upheld the admission of a witness' testimony that, one week prior to a murder, a neighbor told the witness that the defendant said he planned to rob the victim. *Charleston*, 16 A.3d at 526-27. Rejecting the defendant's claim that the testimony contained inadmissible double hearsay, we held that the testimony was properly admitted for impeachment purposes under Rule 613(b) of the Rules of Evidence. *Id.* at 513, 527. The Ortiz testimony at issue here is similar to

_____

[15] The Commonwealth argues that Lopez's statement to Ortiz was not hearsay because, pursuant to the trial court's instructions, the jury could consider it only to assess Lopez's credibility, and not for the truth of the matter asserted. Commonwealth's Brief at 35. The Commonwealth adds, however, that it views the limiting instruction as "a substantial windfall for [Appellant], since the identification should have been admitted for its truth as both a present sense impression and an excited utterance." *Id.* at 35-36. We need not reach that argument.

that in Charleston and was admissible for the same reason.[16]   Once Lopez

denied that he had told his father the identity of the shooter, Ortiz's

testimony to the contrary was admissible to impeach Lopez's testimony.

Appellant argues that it was improper to permit the testimony in this way

because Ortiz testified after Lopez and Appellant therefore did not have an

opportunity to cross-examine Lopez about Ortiz's testimony.   But Appellant

was free to seek to recall Lopez to conduct such an examination if he

wished, and he cannot rely on the fact that he failed to do so.   *See* Trial Ct.

Op. at 14.

The fact Appellant waited until a day after the objectionable testimony

before he asked for a mistrial weighed strongly against granting his mistrial

motion.   *See* Pa.R.Crim.P. 605(B) ("the motion shall be made when the

event is disclosed").   If Appellant had sought relief immediately after his

objection to the Ortiz testimony was overruled, then, even if the court

denied the mistrial, the trial court could have fashioned relief from potential

prejudice by immediately instructing the jury about the limits on its proper

use of the contested testimony.   By instead waiting a day before making his

motion and then arguing that the relief of a limiting instruction would be too

late and inadequate, Appellant contributed to the problem about which he

now complains.   As previously noted, we presume that a jury follows a trial

---

[16] Appellant makes no argument challenging the admissibility of the
testimony under Rule 613.

court's limiting instruction once it is given. *See Hairston*, 84 A.3d at 666. Any reduction in the remedial benefit resulting from any purported lateness in giving the instruction must be charged to Appellant's own delay. We thus conclude that the trial court did not abuse its discretion in denying Appellant's motion for a mistrial.

In summary, we conclude that the evidence was sufficient to support the verdict; the trial court did not abuse its discretion in admitting the ammunition, Appellant's Twitter postings, and the threat against Ortiz; and the trial court did not abuse its discretion in denying Appellant's motion for a mistrial.

Judgment of sentence affirmed.

Judge Ott joins the memorandum.

Judge Jenkins concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/30/2016