J-S46012-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TYREE PEEL | : | |
| | : | |
| Appellant | : | No. 3459 EDA 2017 |

Appeal from the Judgment of Sentence May 19, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0011697-2015

BEFORE:  BOWES, J., SHOGAN, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                    **FILED NOVEMBER 14, 2018**

Tyree Peel appeals from the May 19, 2017 judgment of sentence of life imprisonment without parole, followed by an aggregate sentence of eight and one-half to seventeen years imprisonment.  The sentence was imposed after a jury convicted him of first-degree murder, carrying a firearm without a license, possessing an instrument of crime, and carrying a firearm in Philadelphia.  We affirm.

The trial court succinctly summarized the facts giving rise to the convictions as follows:

> On the night of August 15, 2015, at or around 7:00 p.m., Thomas Holman and [Appellant], also called "Freaky," met at the intersection of 53rd and Upland Streets in Southwest Philadelphia. Upon meeting, they shook hands and engaged in conversation.  In the early moments of the conversation, [Appellant] pulled out his gun.  As [Mr.] Holman turned and tried to run away, [Appellant] fired multiple times hitting [Mr.] Holman in his chest, rib area and right buttock.  After being shot several times, [Mr.] Holman fell to

the ground and started crawling toward the sidewalk. Shortly thereafter, [Appellant] stood over [Mr.] Homan and fired his gun again, this time hitting him in the head, killing him.

Trial Court Opinion, 12/20/17, at 2 (citations to notes of testimony omitted).

At trial, two eyewitnesses who knew Appellant prior to the shooting identified him as the shooter. Nysirah Harris was standing on the front steps of her home near the intersection where the shooting took place. She had telephoned Mr. Holman to purchase marijuana and he was coming to her house for that purpose. She saw him on the corner and called out to him. He put one finger up, signaling to her that he would be there in a moment, and crossed the street to the intersection of 52nd and Upland Streets. Ms. Harris observed him speaking to Appellant, a man known to her as "Freaky," whom she saw every day at the corner of 53rd and Greenway. As she watched, Appellant pulled out a gun. She heard a loud boom, and Mr. Holman fell. She realized then that Mr. Holman had been shot. Appellant proceeded to walk on Upland Street towards 52nd Street, and then he turned around, returned and stood over Mr. Holman, and shot him again. Ms. Harris ran into her house. When she returned to her front steps a few moments later, she saw Amira Moore in the middle of the street, cradling her boyfriend in her arms and pleading for help.

Ms. Harris told the jury that, initially, she was too afraid to talk to police. She finally called police four days after the murder, and they picked her up at another location and transported her to the station. She explained that she

did not want anyone seeing her getting into a police car. Ms. Harris told police that Appellant shot Mr. Holman. She identified Appellant from a photograph, and she provided a signed written statement and a video statement.

Amira Moore testified that the victim was her boyfriend. They were going out to a family gathering, and Mr. Holman left the house ahead of her. Ms. Moore was talking on her cell phone as she exited the house. She saw Appellant and Mr. Holman talking to each on the corner of 53rd and Greenway, about forty-five feet away from her. It was light outside and there was nothing obstructing her view. She saw Appellant shoot and kill her boyfriend. Ms. Moore gave a statement to police two days later in which she named Appellant as the shooter. She also identified Appellant, whom she had known for several months, from a photographic array.

At the close of the evidence, Appellant asked the court to give a cautionary charge to the jury regarding the reliability of eyewitness identification testimony in accordance with *Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954), but the trial court denied the request. The jury found Appellant guilty of the aforementioned charges, and he was sentenced on May 19, 2017.

Appellant's timely post-sentence motion was denied without a hearing, and he appealed to this Court. Both Appellant and the trial court complied with Pa.R.A.P. 1925. Appellant's sole issue on appeal is

> Did the trial court err and/or abuse its discretion when it denied [Appellant's] request to give a charge to the jury pursuant to

> *Commonweath v. Kloiber*, 106 A.2d 820 (Pa. 1954), where two eyewitness[es] who identified [Appellant] as the assailant had a poor opportunity to observe a quick and highly stressful event involving a weapon from a considerable distance, and where other eyewitnesses misidentified the assailant, and where an eyewitness that later identified [Appellant] failed to identify him at the scene of the crime?

Appellant's brief at 4.

When we review a challenge based on the trial court's refusal to give a specific jury instruction, it is our function

> to determine whether the record supports the trial court's decision. In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal.

*Commonwealth v. Sandusky*, 77 A.3d 663, 667 (Pa.Super. 2011) (quoting *Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa.Super. 2006) (internal citations, quotation marks, and brackets omitted)).

At issue herein is whether the court's refusal to give a *Kloiber* instruction constituted an abuse of discretion. In *Kloiber*, this Court held as follows:

> [W]here the witness is not in a position to clearly observe the assailant or he is not positive as to identity, or his positive

- 4 -

statements as to identity are weakened by qualification, or by the failure to identify the defendant on one or more prior occasions, the accuracy of the identifications is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution.

*Kloiber*, *supra* at 826-27. However, "[w]here the opportunity for positive identification is good and the witness'[s] identification is not weakened by prior failure to identify, but remains, even after cross-examination, positive and unqualified, the testimony as to identification need not be received with caution." *Id*. at 826.

Our High Court clarified in **Commonwealth v. Ali**, 10 A.3d 282, 303 (Pa. 2010), that a defendant is entitled to a **Kloiber** instruction only when a witness "(1) was not in a position to clearly observe the defendant, or is not positive as to identity; (2) equivocated on the identification; or (3) failed to identify the defendant on prior occasions." **See also Commonwealth v. Johnson**, 139 A.3d 1257, 1280-81 (Pa. 2016).

The **Kloiber** instruction is set forth in the Pa.S.S.J.I. (Crim.) 4.07B:

4.07B - IDENTIFICATION TESTIMONY--ACCURACY IN DOUBT

1. In [his] [her] testimony, [name of witness] has identified the defendant as the person who committed the crime. There is a question of whether this identification is accurate.

2. A victim or other witness can sometimes make a mistake when trying to identify the criminal. If certain factors are present, the accuracy of identification testimony is so doubtful that a jury must receive it with caution. Identification testimony must be received with caution [if the witness because of bad position, poor lighting, or other reasons did not have a good opportunity to observe the criminal] [if the witness in [his] [her] testimony is not positive as to identity] [if the witness's positive testimony as to identity is

- 5 -

weakened [by qualifications, hedging, or inconsistencies in the rest of [his] [her] testimony] [by [his] [her] not identifying the defendant, or identifying someone else, as the criminal [at a lineup] [when shown photographs] [give specifics] before the trial]] [if, before the trial, the defendant's request for a [lineup] [specify request] to test the ability of the witness to make an identification was denied and the witness subsequently made a less reliable identification] [if, [give specifics]].

[*First Alternative: Court rules as a matter of law that caution is required:*]

3. In this case [there was evidence that [name of witness] could not see the criminal clearly] [give specifics]. Therefore, you must consider with caution [his] [her] testimony identifying the defendant as the person who committed the crime.

[*Second Alternative: When there is a jury issue as to whether caution is required:*]

3. If you believe that [this factor is] [one or more of these factors are] present, then you must consider with caution [name of witness]'s testimony identifying the defendant as the person who committed the crime. If, however, you do not believe that [this factor] [at least one of these factors] is present, then you need not receive the testimony with caution; you may treat it like any other testimony.

4. You should consider all evidence relevant to the question of who committed the crime, including the testimony of [name of victim or witness], [any evidence of facts and circumstances from which identity, or non-identity, of the criminal may be inferred] [give other circumstances]. You cannot find the defendant guilty unless you are satisfied beyond reasonable doubt by all the evidence, direct and circumstantial, not only that the crime was committed but that it was the defendant who committed it.

Pa.S.S.J.I. (Crim.) 4.07B.

Appellant points out that two eyewitnesses identified him as the shooter at trial: Ms. Harris and Ms. Moore. He contends that they each had two prior opportunities to identify Appellant as the shooter, but failed to do so. The first

opportunity arose at the scene following the shooting. Although it was undisputed that Appellant was standing among a crowd at the scene when police arrived, neither woman pointed him out to police as the shooter.

According to Appellant, each woman had a second opportunity to identify Appellant, but failed to do so. Ms. Moore admittedly went to the hospital where her boyfriend was taken by police, but did not provide his name to police then. Ms. Harris did not call police when she saw Appellant two days later near the scene of the shooting.

We note preliminarily that Appellant did not advance this argument in the trial court in support of his contention that a *Kloiber* instruction was warranted, nor identify it in his statement of matters complained of on appeal. His sole assertion that a *Kloiber* instruction may be indicated was that the two eyewitnesses who identified Appellant as the shooter "had a poor opportunity to observe a quick and highly stressful event involving a weapon from a considerable distance . . ." Concise Statement of Errors Complained of on Appeal, 11/15/17, at 1. In fact, counsel for Appellant conceded at trial that the Commonwealth's two identifying witnesses had never misidentified the defendant.[1] N.T., 5/17/17, at 73.

_____

[1] The court asked defense counsel, "Is there any evidence that the two identifying witnesses ever misidentified the defendant?" N.T., 5/17/17, at 73. Defense counsel responded, "No. There is evidence to suggest that the way they viewed or their opportunity to make an identification would call into question their ability to make an identification." *Id*.

- 7 -

Furthermore, we find no merit in Appellant's contention that the fact that the two eyewitnesses did not immediately take the initiative to seek out police and offer information can be viewed as opportunities where the witnesses "failed" to make an identification. In **Commonwealth v. Reid**, 99 A.3d 427, 449 (Pa. 2014), our High Court reaffirmed that "the need for a **Kloiber** charge focuses on the **ability** of a witness to identify the defendant." (citing **Commonwealth v. Lee**, 585 A.2d 1084, 1087 (Pa.Super. 1991) (finding fear of identifying defendant is not failure to make identification for purposes of propriety of **Kloiber** instruction)); **Commonwealth v. Smith**, 495 A.2d 543, 548-49 (Pa.Super. 1985) (where rape victim initially told police that she did not see her attacker's face because she was scared, but later identified him at the preliminary hearing and trial, refusal to give a **Kloiber** charge did not require reversal). Even where a witness made "prior inconsistent statements [regarding identification] based upon fear of endangerment" alone, our Supreme Court has held that this is not the same as a prior failure of ability to identify a defendant. **Reid**, **supra** at 449. Herein, the two eyewitnesses explained their fear to come forward initially. That reluctance to inform police of the identity of the shooter is not the equivalent of a lack of **ability** to make such an identification.

Appellant's representation that there were other eyewitnesses who misidentified the assailant is not supported by the record. A gentleman who did not see the shooting, but who was interviewed afterwards, told police that

he "saw this guy who I know from the area as Van . . . running eastbound towards 52nd Street." N.T. Trial (Jury) Vol. 2, 5/17/17, at 19. Police Officer John Dobson testified that he came into contact with Van Ringgold on the night before the shooting, and thought the flash description of the shooter sounded like Mr. Ringgold. However, video surveillance confirmed Mr. Ringgold's alibi that he was at a Dollar Tree in Northeast Philadelphia shortly before the shooting, leading the police to conclude that he could not have traveled to the scene in time to have perpetrated the crime.

Sharronda Bundy witnessed the shooting from a second floor window of a house located one-half block away. She told the jury that she heard gunshots and saw a young dark skinned man with facial hair standing over another one. He was wearing a dark pink T-shirt and dark jeans. However, she was unable to see the face or recognize the shooter as the sun was in her eyes. N.T. Trial, 5/17/17, at 45.

The defense called Officer William Argyriou, who testified that as he proceeded to the scene, he saw a tall, light-skinned African-American male in in his early teens jogging away from the direction of the shots fired. He was wearing a red shirt and black pants. He testified that he could not confirm that the young male he saw briefly that day was Appellant. Thus, there were no other eyewitnesses to the crime, and no misidentifications of Appellant by other witnesses.

We turn now to Appellant's argument that Ms. Moore and Ms. Harris were not in a position to clearly observe Appellant. Appellant contends that one eyewitness was thirty feet away; the other was forty-five feet away. According to Appellant, Ms. Harris, the closer of the two, required prescription glasses and, at the time of trial, suffered from depression and anxiety that affected her ability to perceive and recall. Appellant's brief at 22.

It is uncontroverted that the shooting occurred during daylight hours, that the eyewitnesses were in close proximity to Appellant, and that their views of Appellant and the victim were unobstructed. Ms. Harris testified that she saw Appellant's face as he shot the victim. Furthermore, she knew Appellant prior to the shooting, and she was focused on the interaction between Appellant and the victim because she was waiting for Mr. Holman to come to her house. Finally, there was no evidence adduced at trial that, on the day of the shooting, Ms. Harris was not wearing her glasses or that she was taking medications that would affect her ability to perceive the events. Ms. Harris testified that she was certain that Appellant was the shooter.

Ms. Moore, the victim's girlfriend, was standing approximately forty to forty-five feet away from the scene talking on her cell phone. The sound of the initial gunshots drew her attention to Appellant standing over her boyfriend, who was laying on the ground wounded. She knew Appellant from the neighborhood. She testified that she had an unobstructed view of Appellant firing a final shot at her boyfriend's head. When Ms. Moore went to

the police station two days after the murder, she told police that "Freaky" was the shooter. She selected Appellant's photograph from an array, described his clothing in detail, and recounted how he shot and killed her boyfriend. At trial, she testified that she had no doubt that Appellant was the shooter.

The two eyewitnesses were in positions from which they could clearly observe Appellant. In addition, they knew Appellant prior to that day and recognized him. Their identifications of Appellant as the shooter were unequivocal, and they had not misidentified or failed to identify Appellant on any prior occasions. On these facts, the *Kloiber* charge was unwarranted and we find no abuse of discretion in the trial court's refusal to give it. Instead, the court instructed the jury in accordance with Pa.S.S.J.I. (Crim.) 4.07(a),[2]

---

[2] The suggested standard jury instruction on the identification of witnesses generally provides:

> 1. In [his] [her] testimony, [name of witness] has identified the defendant as the person who committed the crimes. In evaluating [his] [her] testimony, in addition to the other instructions I will have provided to you for judging the testimony of witnesses, you should consider the additional following factors:
>
> > a. Did the witness have a good opportunity to observe the perpetrator of the offense?
> >
> > b. Was there sufficient lighting for [him] [her] to make [his] [her] observations?
> >
> > c. Was [he] [she] close enough to the individual to note [his] [her] facial and other physical characteristics, as well as any clothing [he] [she] was wearing?

the standard instruction regarding the identification of witnesses, which was appropriate based on the record.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/14/18

_____

d. Has [he] [she] made a prior identification of the defendant as the perpetrator of these crimes at any other proceeding?

e. Was [his] [her] identification positive or was it qualified by any hedging or inconsistencies?

f. During the course of this case, did the witness identify anyone else as the perpetrator?

2. In considering whether or not to accept the testimony of [name of witness], you should consider all of the circumstances under which the identifications were made. Furthermore, you should consider all evidence relative to the question of who committed the crime, including the testimony of any witness from which identity, or non-identity of the perpetrator of the crimes may be inferred. You cannot find the defendant guilty unless you are satisfied beyond reasonable doubt by all the evidence, direct and circumstantial, not only that the crime was committed but that it was the defendant who committed it.

Pa. SSJI (Crim.) 4.07A.